STATE of Wisconsin, Plaintiff-Respondent,

v.

Esequiel MORALES-PEDROSA,
Defendant-Appellant.†

Court of Appeals

*No. 2015AP1072–CR. Submitted on briefs December 17, 2015.
—Decided April 6, 2016.*

2016 WI App 38

(Also reported in 879 N.W.2d 772.)

† Petition for Review Filed.

78

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Colleen Marion*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri*, assistant attorney general, and *Brad D. Schimel*, attorney general.

Before Reilly, P.J., Gundrum and Hagedorn, JJ.

¶ 1. GUNDRUM, J. Esequiel Morales-Pedrosa appeals his judgment of conviction following a jury trial and the trial court's denial of his postconviction motion seeking a new trial. All fourteen counts of the judgment relate to Morales-Pedrosa sexually assaulting his teenage daughter, B.M., on multiple occasions. Morales-Pedrosa contends his trial counsel provided him ineffective assistance by failing to (1) object on the ground of impermissible "vouching" to testimony by a State expert witness that it is "commonly understood that approximately 90 percent of reported cases are true" and (2) object to "other acts" evidence that Morales-Pedrosa had sex with the victim's mother—who, at the time of trial, had been with Morales-Pedrosa for nearly twenty years and married to him for approximately twelve years—when she was the same age as the victim. He also claims his right under the Sixth Amendment to the United States Constitution to confront his accuser was violated when other witnesses testified regarding statements B.M. had previously made to them because such testimony was presented after B.M. had testified and was "excused." We conclude trial counsel was not ineffective and Morales-Pedrosa's confrontation right was not violated. We affirm.

*Background*

¶ 2. Morales-Pedrosa's convictions relate to him sexually assaulting B.M. on three separate occasions when she was between the ages of thirteen and fifteen. At his trial, the State presented the following witnesses relevant to this appeal: B.M.; B.M.'s mother, who is also Morales-Pedrosa's wife; City of Kenosha Police Officer Willie Hamilton and Detective David May; Kenosha County Child Protective Services Inves-

80

tigator Julie Ortiz; student liaison Gary Vargas from B.M.'s school; and forensic interviewer Julie McGuire. The defense presented no witnesses.

¶ 3. B.M. testified first. At the time of trial, she was eighteen years old and living with her grandparents in Ohio. She testified extensively as to the specifics of the sexual assaults Morales-Pedrosa perpetrated on her, the circumstances surrounding the assaults, and her reporting of the abuse. When direct examination questioning began to get into sensitive details related to the assaults, B.M. indicated she "want[ed] to leave." The trial court permitted a recess but stated it was not ordering B.M. to stay, to which the prosecutor responded that B.M. was "under subpoena," a point no one disputed. After the recess, B.M. returned to the stand and testimony continued. The court later recessed for lunch and, thereafter, B.M. again returned to the stand.

¶ 4. B.M. testified that around September 2011 she had told her mother and student liaison Vargas something was going on at home involving her and Morales-Pedrosa, but did not tell them everything that had been happening. On May 13, 2012, about a week after the most recent assault, B.M. spoke with Hamilton, told him "what was going on," and eventually wrote out a statement, which was admitted by the State into evidence, without objection, as exhibit 2. B.M. also testified, without objection, regarding a statement about the assaults she provided to May on May 14, 2012, exhibit 3, and regarding a letter she wrote to the court and prosecutor in 2012 recanting her statements. She wrote the recantation "because I don't want nothing to happen to my dad" and "because that

would ruin my family." B.M. testified that she subsequently reconfirmed to the prosecutor that her original allegations were true.

¶ 5. On cross-examination, trial counsel questioned B.M. regarding statements she made to Hamilton and May related to the assaults, including questioning her regarding exhibits 2 and 3 and her recantation. Counsel also cross-examined B.M. regarding statements she made to Vargas and Ortiz during a September 2011 meeting they had with her at her school. Counsel secured acknowledgments from B.M. that during this meeting she told Vargas and Ortiz she did feel safe in her home, "mom and dad fight a lot," Morales-Pedrosa is "mean," and she wanted to "get out of the house." After redirect, recross, and re-redirect examination, the court told B.M., "You may step down. Please watch your step. You are excused from these proceedings at this time."

¶ 6. Vargas testified next regarding statements B.M. made to him about not feeling safe at and wanting to leave home, Morales-Pedrosa "touch[ing] her," and her family not believing her and likely "disown[ing] her" because of her allegations. Trial counsel objected to certain of Vargas's testimony on confrontation grounds,[1] which objections the trial court overruled. On cross-examination, counsel questioned Vargas regarding statements B.M. made to him

---

[1] Throughout the trial, the Confrontation Clause objections by Morales-Pedrosa's trial counsel were routinely accompanied by hearsay objections. Because Morales-Pedrosa raises no hearsay issues on appeal, however, we consider him to have abandoned any such challenges. *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) (issues raised before the trial court but not raised on appeal are deemed abandoned).

about wanting to "get out" of her family, Morales-Pedrosa not allowing her and other family members to have friends over or "do things," feeling safe at home, the "entire family need[ing] help," and "mom and dad hav[ing] marital problems." Counsel secured acknowledgements from Vargas that he raised the issue of sexual abuse with B.M. first by asking her if her father was "touching her," B.M. "clammed up" in response to that question, and B.M. "never even disclosed to [him] anything about sexual stuff."

¶ 7. Child protective services investigator Ortiz testified that in September 2011 she was called in on B.M.'s case due to an initial report that Morales-Pedrosa had touched B.M. inappropriately. When Ortiz spoke with B.M., B.M. told Ortiz her family needed help and counseling, but B.M. would not respond when Ortiz asked if she had been sexually assaulted. Trial counsel objected on confrontation grounds to certain of Ortiz's testimony, which objection the trial court overruled. On cross-examination, counsel questioned Ortiz about the initial report she received regarding B.M.; concerns B.M. expressed regarding her family, including that Morales-Pedrosa was "mean" to the family; B.M.'s lack of disclosure to Ortiz regarding physical or sexual abuse by Morales-Pedrosa; and whether B.M. had told Ortiz she felt safe in her home.

¶ 8. Before the start of testimony on the second day of trial, the State requested to recall B.M. to the stand in order to respond to certain testimony from the previous day. Trial counsel objected, and the trial court denied the State's request.

¶ 9. City of Kenosha Police Officer Hamilton then took the stand and testified regarding B.M. and her mother coming to the police station on May 13, 2012, and B.M. reporting to him that Morales-

Pedrosa had sexually abused her. B.M. wrote out a statement for Hamilton regarding the abuse, exhibit 2. B.M. told him she had not previously disclosed the abuse because "she feared for her safety and her mom's safety." Trial counsel objected to this latter testimony on confrontation grounds and moved to strike it, adding, "I have no opportunity to cross-examine that. That's brand new excuses that we haven't heard before." The court overruled the objection. On cross-examination, counsel questioned Hamilton regarding B.M.'s reporting of the abuse to Hamilton and whether Hamilton was aware how many times Vargas, Ortiz and B.M.'s mother had asked B.M. if Morales-Pedrosa had touched her. On redirect examination, Hamilton testified regarding specific details of the sexual assaults that B.M. wrote in exhibit 2. On re-cross-examination, trial counsel questioned Hamilton regarding a reference B.M. made in that statement to "bruising."

¶ 10. B.M.'s mother also testified. As relevant to this appeal, upon the State's questioning, she testified her age at the time of trial was thirty-three; she "met" Morales-Pedrosa when she was thirteen; she and Morales-Pedrosa got married in 2001 and were currently married; and she and Morales-Pedrosa had five children together. In response to the State's inquiry, she provided the names and ages of each child, the oldest of whom, B.M.'s older brother, was nineteen at the time of trial.

¶ 11. City of Kenosha Police Detective May testified regarding the statement related to the abuse that B.M. signed on May 14, 2012, exhibit 3. May read from that statement intimate details of the three assaults B.M. informed May of on that date. Trial

counsel objected on confrontation grounds throughout this testimony; the trial court overruled the objections. Trial counsel then cross-examined May regarding exhibit 3, including procuring acknowledgement that it was May, not B.M., who first used the words "vagina," "breast," and "penis."

¶ 12. Forensic interviewer McGuire testified as an expert witness for the State with regard to behaviors commonly observed in child victims of abuse. On redirect examination, the prosecutor asked McGuire, without objection, "in your training and experience when you're eliminating the alternative hypotheses,[2] is it commonly understood that approximately 90 percent of reported cases are true?" McGuire responded, "Correct." (Footnote added.)

¶ 13. The jury convicted Morales-Pedrosa on all counts. He thereafter filed a postconviction motion seeking a new trial, alleging ineffective assistance of counsel. Following a *Machner*[3] hearing, the postconviction court denied the motion. Morales-Pedrosa appeals, arguing the court erred in denying his postconviction motion, and further contending his Sixth Amendment Confrontation Clause rights were violated at trial. Additional facts are set forth as necessary.

---

[2] Earlier, on cross-examination, trial counsel questioned McGuire about an "alternative hypothesis" related to abuse allegations. "Alternative hypothesis" was described through McGuire's testimony as follows: "one hypothesis is the child is making an allegation and the allegation is true"; "an alternative hypothes[i]s is the child made an allegation and for some reason that allegation is either mistaken or false."

[3] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

*Discussion*

*Ineffective Assistance Challenges*

¶ 14. Morales-Pedrosa claims his trial counsel was ineffective in failing to object at trial to McGuire's confirmation that it is "commonly understood that approximately 90 percent of reported cases are true" and to "other acts" testimony indicating Morales-Pedrosa "had sex" with B.M.'s mother (Morales-Pedrosa's wife) when she was the same age as B.M. We disagree.

¶ 15. To succeed on a claim of ineffective assistance of counsel, a defendant must show counsel's performance was deficient and the deficiency prejudiced him/her. *See State v. Erickson*, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). If the defendant fails to prove one prong, we need not address the other. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984).

¶ 16. To prove deficient performance, a defendant must show that counsel's acts or omissions were "outside the wide range of professionally competent assistance," *see id.* at 690, and were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *see State v. Maloney*, 2005 WI 74, ¶ 24, 281 Wis. 2d 595, 698 N.W.2d 583. The defendant must overcome a strong presumption he/she received adequate assistance and counsel acted reasonably within professional norms. *See State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990); *see also State v. Domke*, 2011 WI 95, ¶ 36, 337 Wis. 2d 268, 805 N.W.2d 364;

*State v. Kimbrough*, 2001 WI App 138, ¶¶ 31–35, 246 Wis. 2d 648, 630 N.W.2d 752. Significant to this case, counsel does not perform deficiently in failing to "object and argue a point of law" that is "unclear." *State v. Thayer*, 2001 WI App 51, ¶ 14, 241 Wis. 2d 417, 626 N.W.2d 811.

¶ 17. To prove prejudice, a defendant must show the alleged errors of counsel were "of such magnitude that there is a reasonable probability that, absent the errors, 'the result of the proceeding would have been different.' " *Erickson*, 227 Wis. 2d 758, 769 (quoting *Strickland*, 466 U.S. at 694). "It is not sufficient for the defendant to show that his counsel's errors 'had some conceivable effect on the outcome of the proceedings,' " *Domke*, 337 Wis. 2d 268, ¶ 54 (citations omitted); rather, he/she must demonstrate that an alleged error of counsel actually had some adverse effect, *see State v. Keeran*, 2004 WI App 4, ¶ 19, 268 Wis. 2d 761, 674 N.W.2d 570 (2003). Speculation about what the result of the proceeding might have been is insufficient. *Erickson*, 227 Wis. 2d at 774.

¶ 18. Both deficient performance and prejudice present mixed questions of fact and law. *State v. Jeannie M.P.*, 2005 WI App 183, ¶ 6, 286 Wis. 2d 721, 703 N.W.2d 694. We uphold the trial court's factual findings unless clearly erroneous, *State v. Thiel*, 2003 WI 111, ¶ 21, 264 Wis. 2d 571, 665 N.W.2d 305; but whether counsel's performance was deficient or prejudicial is a question of law we review de novo. *Jeannie M.P.*, 286 Wis. 2d 721, ¶ 6.

### a. McGuire's Testimony

██

¶ 19. On redirect examination, McGuire stated "correct" to the prosecutor's question: "[I]n your training and experience when you're eliminating the alternative hypotheses, is it commonly understood that approximately 90 percent of reported cases are true?" Morales-Pedrosa argues such testimony violated the rule of *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984), prohibiting one witness from vouching for the credibility of another witness, and thus Morales-Pedrosa's trial counsel performed ineffectively in failing to object to the testimony. We conclude trial counsel did not perform deficiently, and thus not ineffectively, because the law in Wisconsin was unclear as to whether the type of testimony elicited from McGuire constituted impermissible vouching for B.M.'s credibility.

¶ 20. Morales-Pedrosa first cites to *Haseltine* and *State v. Kleser*, 2010 WI 88, 328 Wis. 2d 42, 786 N.W.2d 144. These cases, however, do not make clear that testimony such as McGuire's constituted improper vouching.

¶ 21. In *Haseltine*, a psychiatrist who had performed "a careful and thorough examination" of the victim, Haseltine's daughter, testified not only as to patterns of behavior exhibited by incest victims generally, but also that in his opinion there "was no doubt whatsoever" Haseltine's daughter was an incest victim. *Haseltine*, 120 Wis. 2d at 96 (majority), 99 (Cane, J., dissenting). We correctly recognized that such testimony constituted an improper opinion that the daughter's testimony that Haseltine had sexually assaulted her was truthful. *Id.* at 95–96. We stated,

88

"[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Id.* at 96.

¶ 22. In *Kleser*, a psychologist examined the defendant and later effectively testified in lieu of him at a reverse waiver hearing, providing in narrative form the defendant's account of the criminal incident at issue even though there was "no question that she had no personal knowledge of those events." *Kleser*, 328 Wis. 2d 42, ¶¶ 20, 28–29, 90, 105. Addressing the seriousness of the homicide offense, the expert also testified: "My opinion of the [homicide] offense as [Kleser] described it was that it was a rage reaction when he was very fearful." *Id.*, ¶ 28. Our supreme court noted with disapproval that the expert's overall testimony "impermissibly suggested both that she believed Kleser's account and that the events actually unfolded as Kleser had portrayed them." *Id.*, ¶ 105.

¶ 23. The case now before us differs substantially from *Haseltine* and *Kleser*. Here, McGuire testified, and it is undisputed, she never even met, much less interviewed or examined, B.M. Thus, there was no risk the jury believed McGuire was providing a personal or particularized opinion as to B.M.'s credibility. Also, McGuire's generalized confirmation that based upon her training and experience "it [is] commonly understood that approximately 90 percent of reported cases are true" did not constitute a statistical "opinion" that was functionally equivalent to her testifying B.M. was being truthful with her accusations in this case. For these reasons, we cannot say, similar to what was said in *Kleser* and *Haseltine*, that McGuire's testimony "invade[d] the province of the

fact-finder as the sole determiner of [B.M.'s] credibility," *see Kleser*, 328 Wis. 2d 42, ¶ 104, or "create[d] too great a possibility that the jury abdicated its fact-finding role to [McGuire] and did not independently decide [Morales-Pedrosa's] guilt," *see Haseltine*, 120 Wis. 2d at 96.

¶ 24. Morales-Pedrosa acknowledges that "Wisconsin does not appear to have any case law directly on point" with the case before us—a significant acknowledgment in light of his claim that his trial counsel performed deficiently by not objecting to McGuire's challenged testimony. He encourages us to seek additional guidance from other jurisdictions; however, the three primary, nonbinding, cases Morales-Pedrosa emphasizes also fail to convince us his trial counsel performed deficiently. In *United States v. Brooks*, 64 M.J. 325 (C.A.A.F. 2007), the government's expert previously had examined the victim and provided testimony that, as the *Brooks* court put it, "suggested that there was better than a ninety-eight percent probability that the victim was telling the truth." *Id.* at 326, 329. "This testimony," the court added, "provided a mathematical statement approaching certainty about the reliability of the victim's testimony." *Id.* at 329. In *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998), the expert also previously examined an alleged victim in the case and then testified at trial, as the *Snowden* court characterized it, that "99.5% of children tell the truth and that the expert, in his own experience with children, had not personally encountered an instance where a child had invented a lie about abuse." *Id.* at 737–38. In *Wilson v. State*, 90 S.W.3d 391 (Tex. Ct. App. 2002), the court noted that the expert there testified that "only two to eight

90

percent of children lie about being sexually assaulted."[4] *Id.* at 392.

¶ 25. Again, McGuire's testimony before the jury made clear she had never examined B.M. She never testified in a manner from which the jury could conclude she had a personal or particularized opinion on whether B.M. was telling the truth or was a victim of abuse. Further, general testimony that "90 percent" of children claiming to have been abused are telling the truth would have less impact on a fact finder and be less obviously objectionable than testimony that "99.5%," "98%," or even "92–98%" are telling the truth. Additionally, McGuire never suggested B.M. was like the generalized ninety percent nor connected the statistic to her report of abuse or the likelihood she was telling the truth. *See State v. Harrison*, 340 P.3d 777, 780–81 (Ore. Ct. App. 2014) (In plain error context, court stated the challenged evidence was "not clearly vouching" or otherwise impermissible, noting the testimony of the state's expert witness that "96 to 98 percent of the time when a child makes a disclosure about abuse, there's truth to it . . . stopped short of stating [the victim] was like the 96 to 98 percent of . . .

---

[4] Of these three cases, the statistical testimony in *Wilson v. State*, 90 S.W.3d 391 (Tex. Ct. App. 2002), is more akin to the testimony in the case now before us, in that the expert in *Wilson* effectively stated "92–98%" of children who report abuse are truthful. Additionally, the *Wilson* decision does not state whether the expert in that case had examined the victim. We do note, however, that while the *Wilson* court ultimately determined the trial court erred in admitting the statistical testimony, it also concluded the error was harmless. *Id.* at 394. Moreover, Morales-Pedrosa fails to identify legal authority holding that trial counsel performs deficiently by failing to raise objections in the heat of trial based upon case law from another jurisdiction.

complainants whose reports were truthful," and further stating "it is not apparent [the expert] even indirectly connected the statistic . . . to [the victim's] report of abuse or its purported veracity."). We leave for another day—and more direct and developed argument on the issue—what type of statistical testimony might effectively constitute improper vouching.

¶ 26. The more narrow ineffective-assistance question before us is decided by the fact Wisconsin law was not clear at the time of Morales-Pedrosa's trial (and remains unclear) on the question of whether general statistical testimony alone might constitute impermissible vouching. Indeed, again, as Morales-Pedrosa acknowledges, there is no Wisconsin case law directly on point on the issue, and neither *Haseltine* nor *Kleser* present a factual situation similar enough to the facts of this case to allow us to say Morales-Pedrosa's trial counsel performed deficiently by not objecting to McGuire's testimony.[5] "Although it might

--------

[5] Although the postconviction court ultimately determined trial counsel did not perform deficiently based on an alternative ground, the court also concluded precedent did not clearly preclude McGuire's testimony in this case:

> There are no cases that disqualify an expert witness, as Ms. McGuire, to give an opinion concerning the generalities of what the statistics show generally for child sexual assault reports as being true. There are no cases that talk about that kind of testimony being disqualified on its face because of being inappropriate. But the opposite is true, that the cases in which an expert witness who has met an alleged victim generally have been disqualified as being vouching or impermissible testimony as to the truth or lack of truth of a complaining alleged victim.

> Since the defense relies on cases in which a witness testifies as to the credibility of an individual that the expert witness has met, and there are no contravening cases that particularly deal with this fact situation, the Court is, I believe, unencumbered with the [sic] being bound by a decision based on that concept alone.

have been ideal for counsel to so object and assert an interpretation of [*Haseltine* and/or *Kleser*] that would benefit [Morales-Pedrosa], the fact is that [counsel] was not deficient in failing to do so." *See State v. McMahon*, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994).

b. "Other Acts Evidence"

■■■■

¶ 27. Morales-Pedrosa next argues his trial counsel was ineffective because he failed to object to "other acts evidence that Mr. Morales-Pedrosa had sex with his wife when she was the same age as the alleged victim." We reject this argument because Morales-Pedrosa was not prejudiced by the professed error.

¶ 28. Morales-Pedrosa claims "[t]he State introduced evidence that B.M.'s mother . . . was 13 years old at the time she first *had sex* with Mr. Morales-Pedrosa and 15 years old when she gave birth to B.M." (Emphasis added.) To be fair, the prosecutor never asked and the mother never explicitly testified about her and Morales-Pedrosa "ha[ving] sex," as Morales-Pedrosa frames the issue. Rather, the questions and answers related to how old B.M.'s mother was when she "met" Morales-Pedrosa and at the time of trial; she and Morales-Pedrosa having five children together; and the names and ages of each child, the oldest of whom was nineteen at the time of trial.[6]

---

[6] The State states in its response brief that it "never introduced any evidence that the victim's mother was thirteen when she first had sex with Morales-Pedrosa, and was fifteen when she gave birth to the victim" and "never asked the victim's mother when she started having sex with Morales-Pedrosa." In reply, Morales-Pedrosa claims it is a "distinction

¶ 29. Morales-Pedrosa claims this testimony of B.M.'s mother was irrelevant and inappropriate "other acts evidence" under Wis. Stat. § 904.04(2)(a) (2013–14),[7] and trial counsel was ineffective in failing to object to it. He relatedly complains about the prosecutor's statements during closing argument that (1) the "[f]irst charged incident is in 2008 when [B.M.] was 13 years old, about the same age her mom was when the defendant and her mother got together"; (2) "[i]n August of 2010, [B.M.] was 14 years old, the exact same age as her mother when her mother had [B.M.'s brother]"; and (3) "you know that [B.M.'s mother] got together with the defendant when she was only 13 or 14 years old." Regardless of whether trial counsel should have objected to the challenged testimony and/or argument, we conclude Morales-

without a difference" that the testimony really was that B.M.'s mother was thirteen when she "met" Morales-Pedrosa, not when she "had sex" with him, "given that the couple had a child together approximately one year later." For consideration of an ineffective assistance of counsel claim, we think there is a meaningful difference between the manner in which the questions were actually asked and answered in front of the jury versus the manner in which Morales-Pedrosa character-izes them on appeal. As asked and answered, the questions would not raise red flags to reasonable trial counsel. Further-more, Morales-Pedrosa's trial counsel would have looked fool-ish to the jury if he objected to the challenged questions actually asked by the State, which merely inquired as to the age of Morales-Pedrosa's wife at the time of trial and when the two "met" and the ages of their children. Additionally, it is questionable whether the trial court would have sustained an objection to the questions as they were actually asked, even if counsel had objected.

[7] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

Pedrosa was not prejudiced by counsel's failure to object due to the very reasons he contends the evidence was irrelevant.

¶ 30. As Morales-Pedrosa states in his brief-in-chief:

> Mr. Morales-Pedrosa is 3 years older than his wife [B.M.'s mother], and was also a teenager at the time. Moreover, there is no evidence that they were related to one another, or that the relationship was involuntary on [his wife's] part. These circumstances are night and day from the facts of this case—an adult father forcefully sexually assaulting his teenage daughter. (Footnote omitted.)

Despite the prosecutor's apparent—and misguided—attempt to make a connection between Morales-Pedrosa's teenage relationship with his wife and his assaults upon his daughter in this case, we believe it highly unlikely jurors were swayed to convict Morales-Pedrosa due to learning that approximately twenty years earlier he, as a teenager himself, began an intimate relationship with the teenage girl who would become, and still was at the time of trial, his wife and the mother of their five children. As Morales-Pedrosa himself points out, there was no evidence before the jury "that they were related to one another, or that the relationship was involuntary on [the mother's] part." The State echoes Morales-Pedrosa's points, arguing "[i]t simply does not follow" that a teenage boy who is in a mutually agreeable intimate relationship with his teenage girlfriend "would have forcible sex with his daughter long after he became an adult." We agree with Morales-Pedrosa that the circumstances surrounding the early years of his relationship with his wife were "night and day from the facts of this case." We cannot conclude—as we would need to do to deter-

mine Morales-Pedrosa was prejudiced by trial counsel's failure to object to the challenged evidence and/or argument—that "there is a reasonable probability that, but for counsel's [failure to object], the result of [Morales-Pedrosa's trial] would have been different." *See Strickland*, 466 U.S. at 694.

*Confrontation Clause Challenge*

¶ 31. Morales-Pedrosa argues his Sixth Amendment right to confront B.M. was violated when Vargas, Ortiz, Hamilton, and May testified regarding statements B.M. had previously made to each of them because such testimony was presented after B.M. had testified and was "excused." Because the record does not show that B.M. was unavailable for recall to the stand after these other witnesses testified and because Morales-Pedrosa had a full and fair opportunity to cross-examine B.M. and these other witnesses, we conclude Morales-Pedrosa's confrontation right was not violated.

¶ 32. Whether a defendant's confrontation right has been violated is a question of constitutional fact. *State v. Jackson*, 216 Wis. 2d 646, 655, 575 N.W.2d 475 (1998). Thus, "we adopt the circuit court's findings of fact, unless clearly erroneous, but independently apply those facts to the constitutional standard." *Id.*

¶ 33. We find our supreme court's decision in *State v. Nelis*, 2007 WI 58, 300 Wis. 2d 415, 733 N.W.2d 619, determinative. In *Nelis*, a subpoenaed witness, Steve Stone, testified for the State regarding statements he made to police related to a sexual assault by Nelis, as well as regarding Stone's personal observa-

tions related to the assault. *Id.*, ¶¶ 2, 10. At the conclusion of Stone's testimony, the trial court told Stone he could "step down." *Id.*, ¶ 11. The State subsequently called to the stand the local police chief, who testified as to other, inconsistent statements Stone made regarding the assault. *Id.*, ¶¶ 10, 15–16. In his eventual appeal to our supreme court, Nelis claimed, as the *Nelis* court phrased it, that his right to confront Stone was violated when the chief was allowed to testify regarding "undisclosed oral statements of . . . Stone . . . after . . . Stone had been excused as a witness." *Id.*, ¶ 24. According to the *Nelis* court, Nelis complained he was not afforded an opportunity to cross-examine Stone regarding Stone's oral statements to the police chief because "the State did not examine [Stone] concerning such statements," those statements were not disclosed prior to the chief's testimony, "Stone had already testified and was told by the court that he could 'step down,' " and Stone "was not required to remain for possible recall to the witness stand." *Id.*, ¶¶ 44–45.

¶ 34. The *Nelis* court held Nelis' confrontation right was not violated because

> "the Confrontation Clause places no constraints at all" on the use of prior testimonial statements when the declarant appears for cross-examination, as did . . . Stone. *Crawford* [*v. Washington*], 541 U.S. [36,] 59 n.9 [(2004)]. It makes no difference, under the circumstances here, whether the burden is on the State or on Nelis to show that . . . Stone was available for further cross-examination after the court told him he could "step down." . . . Stone testified at trial and was cross-examined concerning his statements to the police; therefore, Nelis' right to confrontation was not violated.

97

*Nelis*, 300 Wis. 2d 415, ¶ 46. Although the *Nelis* court stated the following was "not necessary" to its holding, it nonetheless added:

> [T]he record does not establish that . . . Stone was unavailable for further cross-examination after his earlier testimony at trial. He was called as a witness and testified . . . . After . . . Stone was subjected to direct, cross, and redirect examination, the court told him that he could "step down." There is nothing in the record indicating the whereabouts of . . . Stone after that. The record certainly demonstrates that . . . Stone had been examined extensively, at trial, about his observations concerning the alleged sexual assault. We are satisfied that the record presented fails to establish that . . . Stone was unavailable, so that he could not have been recalled to testify again about his observations after the testimony of [the police chief].

*Id.*, ¶ 47. The court further stated:

> Stone testified at trial, and Nelis' counsel had a full and fair opportunity to cross-examine him about his observations and his statements to the police, as well as the opportunity to cross-examine [the chief] regarding . . . Stone's oral statements to the police. On cross-examination, Nelis' attorney asked . . . Stone questions about his statements to police on the night of the alleged sexual assault incident. These facts, combined with the fact that the record does not establish that [Stone] was unavailable for recall to the stand, satisfy us that there was no violation of Nelis' [confrontation] right.

*Id.*, ¶ 48.

¶ 35. Morales-Pedrosa attempts to distinguish *Nelis*. He argues that after Stone testified, he "was told he could 'step down,' but the record did not show that he was thereafter unavailable"; but here B.M. "was told she was 'excused' and her whereabouts were

thereafter unknown." "Therefore," Morales-Pedrosa asserts, "the record shows that B.M. was unavailable for subsequent examination." Morales-Pedrosa misreads the record.

¶ 36. B.M. testified as the first witness for the State. At the time of trial, she was living with her grandparents in Ohio; she was in Kenosha, at least in part, to provide testimony at this trial. When direct examination questioning began to address sensitive matters related to the assaults, B.M. indicated she "want[ed] to leave." The trial court permitted a recess and stated it was not ordering B.M. to stay, to which the prosecutor responded that B.M. was "under subpoena," a point no one disputed. After the recess, B.M. returned to the witness stand and continued her testimony. The court later recessed for lunch, and B.M. thereafter again returned to the stand. After cross, redirect, recross, and re-redirect examination, the court told B.M., "You may step down. Please watch your step. You are excused from these proceedings at this time."

¶ 37. Vargas and then Ortiz followed B.M. as witnesses on the first day of trial, and Hamilton and May testified on the second day. Trial counsel objected on Confrontation Clause grounds to testimony by each of these witnesses related to statements B.M. made to each of them. As part of his objection to such testimony by Vargas, counsel added, "I have no opportunity to cross-examine [B.M.] on this." The court overruled the objection, stating, "There's nothing to prevent her from being called by you. I don't see—She has been here." When counsel again objected on confrontation grounds a few questions later, he commented, "I don't know where she is. The issue isn't whether I can subpoena her or can get her at this stage . . . ." In light of the trial

court's prior statement, this latter comment by counsel suggests counsel was neither doubting B.M.'s overall availability for further testimony nor particularly interested in securing additional testimony from her.

¶ 38. The record does not indicate B.M. had ever been clearly released from her subpoena following her testimony.[8] Significantly, in its response brief, the State asserts the trial transcript demonstrates B.M. "continued to be available to return to the stand" because it shows that before the start of testimony on the second day of trial—after Vargas and Ortiz had testified—the prosecutor asked the court to permit the State to recall B.M. to the stand in order to respond to certain testimony from the prior day. Morales-Pedrosa fails to respond to this point in any way in his reply brief. While the trial court ultimately rejected the prosecutor's request, the fact that the prosecutor made the request—with no doubts raised by any party or the court as to B.M.'s actual availability—indicates B.M. remained available for further testimony. Furthermore, if Morales-Pedrosa had any true interest in recalling B.M. to the stand, he had a perfect opportunity to pursue such an interest at that time. He did not do so, but rather even objected to B.M.'s return to the stand. The record does not indicate to us that Morales-Pedrosa would have been unable to fairly readily recall B.M. to the stand had his counsel actually chosen and made an effort to do so. We conclude that, at a minimum, "the record does not establish that [B.M.] was unavailable for recall to the stand." *See Nelis*, 300 Wis. 2d 415, ¶ 48.

---

[8] The court's statement, "You are excused from these proceedings at this time," could be fairly understood to mean "You *now* are excused from these proceedings," or "You are excused from these proceedings *for now.*"

¶ 39. Furthermore, Morales-Pedrosa had full and fair opportunity to cross-examine B.M., Vargas, Ortiz, Hamilton, and May regarding B.M.'s statements. And he utilized that opportunity. On cross-examination of B.M., Morales-Pedrosa's counsel questioned her regarding statements she made to Vargas and Ortiz, as well as to Hamilton and May—including questioning regarding exhibits 2 and 3, the statements she respectively provided to Hamilton and May in relation to the abuse. In addition, counsel cross-examined Vargas regarding statements B.M. made to him about her family, her home life, and Morales-Pedrosa. Counsel also cross-examined Ortiz about concerns B.M. expressed regarding her family including that Morales-Pedrosa was "mean" to the family; B.M.'s lack of disclosure to Ortiz regarding physical or sexual abuse by Morales-Pedrosa; and whether B.M. had told Ortiz she felt safe in her home.[9] Counsel also cross-examined Hamilton regarding B.M.'s reporting of the abuse to him and May regarding exhibit 3.

---

[9] Morales-Pedrosa's Confrontation Clause "argument" related to Ortiz is undeveloped. Further, the only testimony of concern Morales-Pedrosa cites—and addresses only in his reply brief—is that Ortiz "testified that B.M. told her that her family had problems and needed therapy"; however, Morales-Pedrosa did not object to this testimony at trial, and thus forfeited any complaints with regard to it. *See State v. Perry*, 215 Wis. 2d 696, 704–05, 573 N.W.2d 876 (Ct. App. 1997) (complaint on appeal is forfeited where complaining party failed to timely object at trial); *see also Wisconsin Conference Bd. of Trs. of United Methodist Church, Inc. v. Culver*, 2001 WI 55, ¶ 38, 243 Wis. 2d 394, 627 N.W.2d 469 (we do not address issues that are not adequately developed). Nonetheless, for the reasons stated in this opinion, we conclude Morales-Pedrosa's Confrontation Clause rights were not violated in relation to Ortiz's testimony.

¶ 40. As to Hamilton's testimony, Morales-Pedrosa raises another, specific complaint. He claims his confrontation rights were violated when Hamilton testified B.M. had told him she did not report the assaults earlier because "she feared for her safety and her mom's safety." Morales-Pedrosa asserts he "had no opportunity to cross-examine B.M." with regard to this statement. We reject Morales-Pedrosa's complaint in that it is no different than that raised by Nelis that he did not have an opportunity to cross-examine Stone regarding Stone's oral statements to the police chief because those statements were not made known prior to the chief's testimony. *Id.*, ¶¶ 44–45. Again, our supreme court rejected this complaint by Nelis, stating "Stone testified at trial and was cross-examined concerning his statements to the police; therefore, Nelis' right to confrontation was not violated." *Id.*, ¶ 46. Likewise here, B.M. "testified at trial and was cross-examined concerning [her] statements" to Hamilton. As already discussed, Morales-Pedrosa had a full and fair opportunity to cross-examine both B.M. and Hamilton. Furthermore, as also discussed, the record does not indicate B.M. was unavailable for further testimony if trial counsel had sought it.

¶ 41. Because the State produced B.M. as a witness at trial, "[t]he record does not establish that [B.M.] became unavailable for recall to the stand," and Morales-Pedrosa had full and fair opportunity to cross-examine B.M. as well as the other relevant witnesses, Morales-Pedrosa's Confrontation Clause rights were not violated.

*By the Court.*—Judgment and order affirmed.