COURT OF APPEALS
DECISION
DATED AND FILED

August 6, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.　　2023AP2314

STATE OF WISCONSIN

Cir. Ct. No. 2022ME199

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF L. M. R.:

BROWN COUNTY,

　　PETITIONER-RESPONDENT,

　V.

L. M. R.,

　　RESPONDENT-APPELLANT.

---

　　　　APPEAL from orders of the circuit court for Brown County: JOHN P. ZAKOWSKI, Judge. *Affirmed*.

　　　　¶1　　STARK, P.J.[1]　Luke[2] appeals orders for his involuntary commitment and his involuntary medication and treatment pursuant to WIS. STAT. §§ 51.20 and

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

51.61(1)(g), respectively, as well as an order denying his postcommitment motion to vacate the commitment and medication orders. Luke argues that Brown County presented insufficient evidence to support the circuit court's finding of dangerousness, that the court failed to make the specific factual findings of his dangerousness as required by *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, and that he was deprived of his right to effective assistance of counsel due to his attorney's failure to object to hearsay evidence. He further argues that even if we affirm the court's commitment order, the County presented insufficient evidence to support his involuntary medication and treatment order. We reject these arguments, and accordingly we affirm.

## BACKGROUND

¶2      Luke was emergently detained in March 2022, after he was found walking down a public street completely naked. Luke was unable to recall the last time he took his medication, ate food, or drank water, and he stated that he had been unable to sleep for the last two days. Luke explained that he was walking naked because he is "a free man, [and] [G]od told [him] today is the day of salvation."

¶3      After a probable cause hearing, the circuit court found that there was probable cause to have Luke involuntarily committed pursuant to WIS. STAT. § 51.20. The court ordered that Luke be examined, and it scheduled a final hearing. At the final hearing, the County called three witnesses: crisis counselor

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

2

Antonio Nelson, Green Bay Police Department Patrol Officer Heath Hermans, and psychiatrist Marshall Bales.

¶4    Nelson testified to the above facts. *See supra* ¶2. Officer Hermans testified that he responded to a call regarding Luke walking naked down the street and that when he arrived at Luke's location, Luke was in custody, still fully naked, and across the street from the Boys and Girls Club. Hermans stated that Luke had been driving, pulled his car over, took his clothes off, and then began walking down the street. Luke performed these actions while it was twenty-five or thirty degrees Fahrenheit outside. According to Hermans, Luke explained that he was "cleansing himself for God" and that he would strip and walk naked again if he is not committed.

¶5    Doctor Bales testified that he examined Luke, that Luke suffers from bipolar disorder, and that Luke was manic and psychotic at the time of the examination. Bales stated that Luke's mental illness manifested itself in religious preoccupation, including Luke believing that he was "God-like." Bales opined that Luke's disorder is treatable with medication and that he explained to Luke the advantages, disadvantages, and alternatives to Luke's medication. However, according to Bales, Luke stated that he did not want any psychotropic medication,[3] described the medication as "bondage" and "demonic," and could not express anything about the medication review or apply it to himself. Bales testified that Luke's mental illness prevented him from understanding the advantages of

---

[3] Doctor Bales testified that while Luke was opposed to any psychotropic medication, Luke was not opposed to taking testosterone. Bales clarified that testosterone is not an antipsychotic medication.

medication, and he therefore opined that Luke was incompetent to refuse medication.

¶6 Doctor Bales' report was admitted into evidence. In that report, Bales described Luke's medication and listed the specific advantages, disadvantages, and alternatives to that medication, which he had explained to Luke. The report stated that Luke is incapable of understanding the advantages and disadvantages of his medication, and he is incapable of applying them to his situation.

¶7 Regarding Luke's dangerousness, Dr. Bales opined that Luke was dangerous under WIS. STAT. § 51.20(1)(a)2.c and 2.d. Bales explained that this opinion was due to Luke being naked in the cold weather. Bales then stated that he saw Luke in 2019 when Luke had done the same thing while "it was 30-below windchill," and Luke suffered from frostbite during that incident. Luke's counsel did not object to Bales' references to the 2019 incident.

¶8 Luke testified that he stopped taking his medication because he was getting dizzy at work and throwing up. He stated that he wanted to keep working at his two jobs, talked about his religious views, and said that, on the date of the incident, he was following the wishes of the Lord—he "just wanted to get the gospel out at that time."

¶9 The circuit court found that Luke was mentally ill, a proper subject for treatment, and created a danger to himself. The court stated that it found Luke a danger to himself because his lack of insight into his mental illness resulted in his being naked outside in freezing or subfreezing temperatures on two different occasions. The court also found that Luke was not competent to refuse medication because he is substantially incapable of applying an understanding of the

advantages, disadvantages, and alternatives of medication to his condition. The court entered orders for Luke's involuntary commitment for six months, pursuant to WIS. STAT. § 51.20, and for his involuntary medication and treatment, pursuant to WIS. STAT. § 51.61(1)(g).[4]

¶10 Luke filed a postcommitment motion to vacate the commitment and involuntary medication orders, arguing ineffective assistance of counsel. Luke argued that his counsel at the commitment hearing performed deficiently by failing to object to Dr. Bales' testimony regarding Luke's actions precipitating his 2019 commitment as hearsay and that his counsel's deficiency prejudiced him because Bales' testimony was "critical to a determination of the issue" and was not duplicative of any properly admitted evidence.[5] The circuit court entered a written order denying Luke's motion without a hearing, stating that it did not consider the testimony regarding the 2019 commitment to be "very significant" and that "[t]he court would have made the same findings independent of any mention of the 2019 incident." Luke now appeals.

---

[4] The circuit court's oral finding of dangerousness corresponds to WIS. STAT. § 51.20(1)(a)2.c. However, the court's written order states that Luke is dangerous under § 51.20(1)(a)2.a. We note that "an unambiguous oral pronouncement controls" when there is a conflict between an oral pronouncement and a written order. *See State v. Prihoda*, 2000 WI 123, ¶24, 239 Wis. 2d 244, 618 N.W.2d 857. Thus, this court analyzes whether Luke is dangerous under § 51.20(1)(a)2.c. Luke does not challenge the discrepancy between the court's oral ruling and written order. Accordingly, we do not address this issue any further.

[5] Luke also argued in his motion that the circuit court failed to make sufficient factual findings to satisfy *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277. The circuit court did not address this argument in its decision and order. Because Luke raises this argument again on appeal, we address the merits of this claim later in our analysis. *See infra* ¶¶20-22.

# DISCUSSION

¶11 Luke raises several arguments regarding the involuntary commitment proceedings. First, Luke argues that the County presented insufficient evidence of his dangerousness and that the circuit court failed to make specific factual findings of his dangerousness. Relatedly, Luke contends that his commitment hearing counsel was ineffective for failing to object to hearsay evidence. Finally, Luke argues that the evidence was insufficient to support an involuntary medication order.[6]

---

[6] As an initial matter, the County argues solely that Luke's appeal is moot because the involuntary commitment order and the involuntary medication order have expired. The County acknowledges that, pursuant to *Sauk County v. S.A.M.*, 2022 WI 46, 402 Wis. 2d 379, 975 N.W.2d 162, appeals of an expired involuntary commitment order are typically not moot due to the collateral consequences of the firearms ban and mandatory cost of care associated with the commitment. *See id*, ¶¶24-27. The County attempts to distinguish the present appeal from *S.A.M.* by noting that case involved a recommitment and that the instant case involves an initial commitment where Luke was already subject to a firearms ban from a prior expired commitment. The County further argues that Luke has not provided any evidence of the monetary costs associated with his commitment.

Mootness is a question of law that we review de novo. *Id.*, ¶17. The County misunderstands and misapplies *S.A.M.* While Luke is subject to a firearms ban from a prior commitment, in *S.A.M.*, our supreme court made it clear that "[p]revailing on appeal would vacate the recommitment order and practically alter a committed person's 'record and reputation' for dangerousness, a factor a reviewing court must consider when weighing a petition to cancel a firearms ban." *Id.,* ¶23 (citation omitted). The County provides no basis in support of a different result in this case involving an initial commitment. Further, our supreme court rejected a nearly identical argument regarding the cost of care due to WIS. STAT. § 46.10(2)'s "mandatory language" imposing the cost of care of an involuntary commitment onto the patient. *S.A.M.*, 402 Wis. 2d 379, ¶25. Accordingly, we conclude that Luke's appeal is not moot.

Because the County fails to respond to the merits of Luke's appeal—and failed to request supplemental briefing in the event that we do not find the appeal moot—Luke correctly argues that we could deem Luke's arguments conceded and reverse on that ground. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). However, we choose to decide this appeal on the merits.

¶12 We review the sufficiency of the evidence and factual findings in a WIS. STAT. § 51.20 involuntary commitment, the sufficiency of the evidence for an involuntary medication order, and ineffective assistance of counsel under a mixed standard of review. *D.J.W.*, 391 Wis. 2d 231, ¶23-24; *Outagamie County v. Melanie L.*, 2013 WI 67, ¶¶37-38, 349 Wis. 2d 148, 833 N.W.2d 607; *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *D.J.W.*, 391 Wis. 2d 231, ¶24. Further, this court "must accept reasonable inferences drawn from the evidence" by the circuit court. *K.S. v. Winnebago County*, 147 Wis. 2d 575, 578, 433 N.W.2d 291 (Ct. App. 1988). "Whether the facts satisfy the statutory standard is a question of law that we review de novo." *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783; *Pico*, 382 Wis. 2d 273, ¶13.

¶13 For a person to be involuntarily committed pursuant to WIS. STAT. ch. 51, a petitioner must prove by clear and convincing evidence that the subject individual is "(1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others."[7] *D.J.W.*, 391 Wis. 2d 231, ¶29. As relevant to this appeal,[8] dangerousness can be established by proving that the individual "[e]vidences such impaired judgment, manifested by evidence of a pattern of

---

[7] Luke does not contest that he is mentally ill or a proper subject for treatment.

[8] WISCONSIN STAT. § 51.20(1)(a)2. provides five different standards of dangerousness. At the final hearing, the County argued that Luke was dangerous under § 51.20(1)(a)2.c. and 2.d. The circuit court found that Luke was dangerous under § 51.20(1)(a)2.c. but did not find Luke dangerous under § 51.20(1)(a)2.d., and we therefore do not discuss this standard or any of the other three standards further.

recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." *See* WIS. STAT. § 51.20(1)(a)2.c.

¶14 In *D.J.W.*, our supreme court mandated that "circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." *D.J.W.*, 391 Wis. 2d 231, ¶3. This mandate has two requirements: (1) that the circuit court make specific factual findings regarding the patient's dangerousness, and (2) that the circuit court identify the specific standard of dangerousness on which the recommitment is based. *See Sheboygan County v. M.W.*, 2022 WI 40, ¶41, 402 Wis. 2d 1, 974 N.W.2d 733 (Hagedorn, J., concurring).

¶15 Here, the circuit court found Luke dangerous because Luke stripped off all of his clothes and walked naked outside when the temperature was freezing or near freezing. The court stated that Luke's behavior was "dangerous" because "people can die from hypothermia" and that Luke was "exposing himself to situations in which he could be badly injured."

¶16 Luke challenges these findings by arguing that he had only "walked a short distance" before being stopped, that there was "no evidence that [he] was shivering," that it was unclear how long he intended to remain unclothed in the freezing weather, and that there was no other evidence that he had been neglecting himself. Luke also notes that he walked to a location "where he was nearly certain to draw public attention to [his] unclothed condition." Luke does not argue that the circuit court's findings were clearly erroneous—nor could he in good faith make that argument, as the court's findings are clearly supported by the evidence

presented at the final hearing. Instead, he appears to argue that the evidence was insufficient to support a finding of a "substantial probability of physical impairment or injury to himself." *See* WIS. STAT. § 51.20(1)(a)2.c.

¶17 Contrary to Luke's assertion, there was evidence that he had been neglecting himself. Nelson testified that he spoke to Luke and confirmed that Luke walked naked down the street, that Luke could not remember when he last ate food or drank water and that Luke had not slept for two days.

¶18 The evidence was also sufficient to support the circuit court's finding that Luke's exposure was dangerous. Officer Hermans testified that the temperature was "between 25, 30 degrees" when Luke was walking naked, that Luke stated he would "do this again" if he were let go, and that Luke had thrown all of his medication away. Doctor Bales stated that there was endangerment, and Bales' report, which was received into evidence, clarified that the endangerment was due to Luke's obliviousness to the weather.

¶19 Regarding Luke's argument that it is unclear how long he planned to walk naked and that he walked to a location "where he was nearly certain to draw public attention to [his] unclothed condition," Luke did not present any evidence that he only planned to be naked in the freezing temperatures for a short time or that he consciously chose the location for the incident to limit his exposure. The circuit court was not required to make those inferences. Rather, the court appears to have inferred that Luke would have continued to remain unclothed in the cold to the point where he would have suffered from hypothermia, and given Luke's statement that he would engage in the same activity again if not committed, this inference was supported by the evidence.

¶20   Luke also challenges the sufficiency of the circuit court's factual findings as they relate to our supreme court's mandate in **D.J.W.**   Regarding Luke's dangerousness, the court stated

> I'm going to find that there's a substantial probability of physical harm to himself due to impaired judgment as manifested by a pattern of recent acts, because as [Dr. Bales] said … there were similarities in terms of what happened in 2019, when we're talking about frostbite conditions but also the thinking process is pretty much the same, the lack of insight into the problems.

Luke argues that the court did not explicitly identify any of the standards of dangerousness set forth in WIS. STAT. § 51.20(1)(a)2. and that its failure to do so violates **D.J.W.**

¶21   Luke misunderstands our supreme court's **D.J.W.** mandate—**D.J.W.** does not require the circuit court to explicitly recite the exact statutory subdivision of dangerousness or to exactly quote the statutory language.  *See **D.J.W.***, 391 Wis. 2d 231, ¶42 (Hagedorn, J., concurring); *see also **State v. Brown***, 2020 WI 63, ¶27, 392 Wis. 2d 454, 945 N.W.2d 584 (observing that "[t]he law generally rejects imposing 'magic words' requirements" (citation omitted)); **Winnebago County v. D.E.S.**, No. 2022AP251, unpublished slip op. ¶13 (WI App Aug. 31, 2022) (concluding that, although the circuit court did not explicitly identify the standard of dangerousness upon which the patient's involuntary commitment was based, the court's actual words and the county's closing arguments sufficiently identified the relevant standard).[9]

---

[9] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

¶22 Here, while the circuit court did not explicitly identify the standard of dangerousness upon which Luke's commitment was based or quote the statutory language exactly, we are satisfied that the court's actual words sufficiently satisfy *D.J.W.*'s requirements. Of the five standards of dangerousness, only WIS. STAT. § 51.20(1)(a)2.c. concerns a person evidencing dangerousness from impaired judgment resulting in the substantial probability of physical harm or injury to oneself. *See* § 51.20(1)(a)2. Indeed, even though the court's written order lists § 51.20(1)(a)2.a. as the standard of dangerousness upon which Luke's commitment is based,[10] Luke himself correctly identifies the court's oral ruling as referring to § 51.20(1)(a)2.c. Further, the court tied this statutory standard to specific factual findings, based on the evidence presented at the final hearing, to Luke's dangerousness. Accordingly, *D.J.W.* was satisfied.

¶23 Related to the circuit court's factual findings is Luke's argument, raised in his postcommitment motion, that he was denied the effective assistance of counsel and that the court erred by failing to hold a hearing on his motion. Specifically, Luke argues that his counsel was ineffective by failing to object to "damaging hearsay" testimony from Dr. Bales regarding the events leading up to his 2019 commitment, in which Luke was walking outdoors and completely naked when "it was 30-below windchill" and Luke suffered from frostbite. Luke contends that this testimony was damaging because it was not duplicative of other properly admitted evidence, the "court utilized it as substantive evidence" when it noted that "there were similarities [to the present case] in terms of what happened in 2019," and then relied upon it to find a pattern of similar dangerous activity.

---

[10] *See supra* note 4.

11

Luke further argues that "[t]he [circuit] court should have conducted a hearing to determine if [he] was deprived of his right to effective assistance of counsel by the lack of objection to the 2019 evidence."

¶24 Pursuant to WIS. STAT. § 51.20(3), the subject of an involuntary commitment proceeding has a right to adversary counsel. The *Strickland*[11] standard for ineffective assistance of counsel applies to WIS. STAT. ch. 51 commitment proceedings. *Winnebago County v. J.M.*, 2018 WI 37, ¶45, 381 Wis. 2d 28, 911 N.W.2d 41. *Strickland* requires that Luke demonstrate that his counsel performed deficiently and that counsel's deficient performance prejudiced Luke's defense to the commitment. *See J.M.*, 381 Wis. 2d 28, ¶47. We need not address both *Strickland* prongs if we conclude that a defendant failed to prove one prong. *Strickland*, 466 U.S. at 697; *see J.M.*, 381 Wis. 2d 28, ¶50.

¶25 "To prove prejudice, a defendant must show the alleged errors of counsel were 'of such magnitude that there is a reasonable probability that, absent the errors, the result of the proceeding would have been different.'" *State v. Morales-Pedrosa*, 2016 WI App 38, ¶17, 369 Wis. 2d 75, 879 N.W.2d 772 (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sholar*, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). If a postcommitment motion alleges sufficient facts that, if true, would entitle the defendant to relief, the circuit court must hold an evidentiary hearing. *See State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. We review de novo whether the motion alleges sufficient material facts that, if true, would entitle the defendant to relief. *See id.*

---

[11] *Strickland v. Washington*, 466 U.S. 668, 690, 694 (1984).

¶26 Here, even if we assume, without deciding, that Luke's counsel performed deficiently, we conclude that Luke's postcommitment motion fails to provide sufficient facts to show that he was prejudiced by his counsel's failure to object to the alleged hearsay. In its written order denying Luke's motion, the circuit court, which also presided over Luke's final commitment hearing, stated that it "[did] not consider the 2019 incident very significant…. To the extent that it is inadmissible hearsay, the court f[ound] it constitutes harmless error." According to the court, it "would have made the same findings independent of any mention of the 2019 incident." The record supports this decision.

¶27 We conclude that the record was sufficient, absent evidence regarding the 2019 incident, for the circuit court to find, based upon a "pattern of recent acts or omissions," that Luke's judgment was impaired such "that there is a substantial probability of physical impairment or injury to himself." *See* WIS. STAT. § 51.20(1)(a)2.c. Luke's continuing and inordinate lack of insight and detachment from reality resulted in his failure to eat, drink water, sleep for two days, and in his walking nude outside in freezing temperatures, which he maintained he would do again if not committed. Further, Luke concedes that given the passage of time, Dr. Bales' hearsay testimony regarding the 2019 incident would have been minimally relevant to the current proceeding. Luke's postcommitment motion failed to allege sufficient facts for the court to find that he was prejudiced by his counsel's failure to object to Bales' hearsay testimony. The court therefore did not err by denying Luke's motion without a hearing.

¶28 Finally, Luke argues that the County presented insufficient evidence to support the circuit court's order for his involuntary medication and treatment pursuant to WIS. STAT. § 51.61(1)(g). Luke contends that Dr. Bales did not provide a sufficient explanation regarding the advantages, disadvantages, and

13

alternatives to Luke's medication. Accordingly, he claims, that the County failed to show by clear and convincing evidence that he was incapable of applying an understanding of his medication to his own condition.

¶29    "[A] person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Melanie L.*, 349 Wis. 2d 148, ¶53. A person is not competent to refuse medication if he or she "is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives," or if he or she "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment." WIS. STAT. § 51.61(1)(g)4.

¶30    To determine whether an individual is incompetent to refuse medication, "the circuit court must first be satisfied that the advantages and disadvantages of, and the alternatives to, medication have been adequately explained to the patient." *Virgil D. v. Rock County*, 189 Wis. 2d 1, 14, 524 N.W.2d 894 (1994). The explanation of the proposed medication "should include why a particular drug is being prescribed, what the advantages of the drug are expected to be, what side effects may be anticipated or are possible, and whether there are reasonable alternatives to the prescribed medication." *Melanie L.*, 349 Wis. 2d 148, ¶67.

¶31    At the final hearing, Dr. Bales testified that during his examination of Luke, he discussed the advantages, disadvantages, and alternatives to medication with Luke. According to Bales, in response to this discussion, Luke

14

stated, "I am an innocent man in the name of the Lord," "I want no medication," and that he "wanted to be free and did not want bondage."[12]  Bales then testified that Luke is incompetent to refuse medication because his mental illness has prevented him from understanding the advantages, disadvantages, and alternatives to medication.

¶32   In Dr. Bales' report—which, again, was admitted into evidence—Bales stated that he discussed Luke's medication with him, including the specific advantages, disadvantages, and alternatives of that medication.  Luke fails to address the sufficiency of Bales' explanation provided in his written report.  We, therefore, conclude that the County proved by clear and convincing evidence that Luke was given a sufficient explanation of his medication and that Luke is incompetent to refuse medication.  *See Outagamie County v. L.X.D.-O.*, 2023 WI App 17, ¶38 407 Wis. 2d 17, 991 N.W.2d 518 (concluding that the doctor's general testimony in conjunction with the doctor's written report—which contained the specific advantages, disadvantages, and alternatives to medication—sufficiently satisfied the requirements of WIS. STAT. § 51.61(1)(g)4. and *Melanie L.*).

*By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[12] Doctor Bales explained that Luke considered psychotropic medications to be "bondage."  Again, we note that Luke was not opposed to taking testosterone, but also that testosterone is not an antipsychotic medication.