# COURT OF APPEALS
# DECISION
# DATED AND FILED

## May 21, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1346-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2017CF34**

**IN COURT OF APPEALS
DISTRICT III**

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

JOBERT L. MOLDE,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Dunn County: ROD W. SMELTZER, Judge. *Reversed and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 GILL, J. Jobert L. Molde appeals a judgment, entered following a jury verdict, convicting him of one count of first-degree sexual assault of a child who had not attained the age of twelve years and one count of incest with a child.

He also appeals an order denying his motion for postconviction relief following a *Machner*[1] hearing.

¶2 On appeal, Molde argues that his trial counsel was constitutionally ineffective by failing to object to an expert's testimony at the jury trial regarding the truthfulness of alleged child sexual assault victims.[2] In particular, the circuit court read a juror-submitted question to the expert, which asked, "How frequent is it for children to make up a story of sexual abuse[?]" The expert responded, without an objection from Molde's trial counsel, "False disclosures are extraordinarily rare, like in the *one percent of all disclosures are false disclosures*." (Emphasis added.)

¶3 We agree with Molde that his counsel performed deficiently by failing to object to this testimony. At the time of Molde's jury trial, the law on impermissible vouching testimony was well settled, and Molde's trial counsel should have known to object to the expert's testimony for two reasons. *See State v. Morales-Pedrosa*, 2016 WI App 38, ¶16, 369 Wis. 2d 75, 879 N.W.2d 772; *State v. Mader*, 2023 WI App 35, ¶¶36-38, 408 Wis. 2d 632, 993 N.W.2d 761, *review denied* (WI Sept. 26, 2023) (No. 2022AP382-CR). First, the expert was directly involved in the victim's examination following her sexual assault

---

[1] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[2] Molde also contends that his trial counsel was constitutionally ineffective by failing to seek the admission of evidence regarding the victim's dishonesty and by withdrawing an objection to the State's proffered evidence of Molde's prior operating a motor vehicle while intoxicated (OWI) conviction and jail sentence. Because we remand for a new trial, we address these two claimed errors in the interest of judicial economy, but we ultimately reject Molde's arguments. *See State v. Rushing*, 197 Wis. 2d 631, 649-50, 541 N.W.2d 155 (Ct. App. 1995) (stating that when remanding for a new trial, we may address nondispositive issues "in the interest of judicial economy if the issues are likely to arise at [the] second trial").

accusation against Molde, and the expert's answer to the juror's question regarding a child's propensity to tell the truth when reporting sexual assault "would inevitably be seen by the jury as 'a personal or particularized' endorsement of [the victim's] credibility." *See **Mader***, 408 Wis. 2d 632, ¶38 (citation omitted). Second, the expert's testimony—which effectively stated to the jury that 99 percent of all child sexual assault reports are true—"'provided a mathematical statement approaching certainty' that false reporting simply does not occur." *See **id.***, ¶39 (citation omitted).

¶4 As a result of trial counsel's deficient performance, there is a reasonable probability that, absent counsel's error, the result of the proceeding would have been different. The impermissible vouching testimony was a direct response to a juror's question; that juror was a member of the twelve-person jury that convicted Molde; the State twice relied upon the impermissible vouching testimony in its closing argument; and the evidence at trial "for and against guilt was nearly in equipoise." *See **id.***, ¶86. We therefore reverse Molde's judgment of conviction and the circuit court's denial of Molde's postconviction motion on this issue, and we remand for a new trial.

## BACKGROUND

¶5 On January 13, 2017, Molde's daughter, Lauren,[3] took a "near lethal" amount of over-the-counter pain medication in her school's bathroom, purportedly in an attempt to take her own life. After school officials were notified,

---

[3] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use pseudonyms for the victim and her siblings. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

they found several notes in her backpack, including one addressed to Molde in which she referenced a "night mom was gone and you made [Whitney[4]] come get me. You told me to be a 'big girl for daddy.'" Lauren later detailed to a school counselor and school nurse that Molde had sexually assaulted her.

¶6 Lauren, who was thirteen years old at the time of the allegations, also provided a full narrative of the sexual assault in an audiovisual forensic interview at a children's advocacy center three days after her suicide attempt. The interview was conducted by a nurse practitioner employed by the children's advocacy center. Thereafter, the State charged Molde with one count of first-degree sexual assault of a child who had not attained the age of twelve years and one count of incest with a child. According to the State, the alleged assault occurred between January 2011 and January 2012.

¶7 The circuit court later granted the State's motion to allow the nurse practitioner to testify at Molde's jury trial as an expert witness. The court stated that the nurse practitioner would assist the jury in understanding the forensic interview as well as why child sexual abuse victims delay reporting abuse. After the State discovered that the nurse practitioner was unavailable for the scheduled jury trial, the circuit court granted the State's motion to use the nurse practitioner's supervisor, Dr. Alice Swenson, instead.

¶8 At the jury trial, Dr. Swenson testified that she is a child abuse pediatrician at the children's advocacy center and that she supervised Lauren's forensic interview in real time. Regarding child sexual abuse victims generally,

---

[4] Whitney is Molde's daughter and Lauren's younger sister.

4

Swenson testified that roughly "90 percent" of child sexual abuse victims delay reporting the abuse and that the "vast majority of sexual abuse cases are perpetrated by a person the victim knows." She also testified that some child sexual abuse victims "end up doing things like self-harming and suicide attempts and end up with very significant emotional behavioral problems." According to Swenson, she assesses a child sexual abuse victim's credibility by determining whether the child provides consistent supporting details, including the physical environment where the abuse took place and "information that a child wouldn't necessarily know about" such as sexual intercourse.

¶9    While Dr. Swenson was on the witness stand, the State played for the jury Lauren's audiovisual forensic interview. In the interview, Lauren stated that on the night of the alleged assault, Stephanie—Lauren's adoptive mother and Molde's wife—had "gone away" for the evening after getting into an argument with Molde. According to Lauren, Whitney was sleeping with Molde upstairs in his bedroom. Lauren stated that Molde "made [Whitney] come down and get [her]." When Lauren arrived in Molde's bedroom, Molde "made [her] take off [her] clothes and told [her] to be a big girl." Lauren stated that Molde then "laid me down on the bed, and he also got undressed" and "[h]e just told me it will be good." Lauren stated that Molde "used his private part and he put it in [her private part]" and that "it hurt." According to Lauren, Molde "had his legs around mine. His arms were above my shoulders." Lauren could not remember if "anything c[a]me out of [Molde's] private part" during the assault, but she did state that Molde did not "put anything on this private part."

¶10    Lauren stated that Whitney was at Molde's bedroom door while Lauren was in the bedroom during the sexual assault, and that the "door was open … most of the way, but it was really dark." She stated, "He stayed on top of

5

me or whatever for awhile, and then like he said he was done. He made me get my clothes and go back to bed." Lauren stated that after she left Molde's room, Whitney told her "she wanted to be a big girl, too." Lauren told her "she didn't," and then she took Whitney back downstairs with her. Lauren stated that in the morning, Whitney asked her "if she could be a big girl, and [Lauren] told her no" and that "it was just a dream, [and] to forget about it." According to Lauren, her two older brothers, Trevor and Heath, were downstairs sleeping during the incident.

¶11     After the forensic interview was played for the jury, Dr. Swenson testified regarding the physical examination conducted of Lauren after Lauren gave her recorded statements. She stated that the physical examination of Lauren yielded no physical signs of sexual abuse. However, she further testified that "[i]n about 97 percent of sexual abuse cases where there's been a report of penetration, there are no findings" during a physical examination.

¶12     Following Dr. Swenson's testimony, and consistent with the circuit court's previous order permitting juror questions, Juror No. 47, who ultimately sat on the twelve-person jury, submitted two written questions for Swenson. Prior to asking the questions of the witness, the court held a sidebar with Molde's trial counsel and the State. Molde's trial counsel did not object to the proposed questions.

¶13     The circuit court then read the questions to the witness with the jury present: "How frequent is it for children to make up a story of sexual abuse[?] Why would they do that[?]" Doctor Swenson responded to the first question, stating, "False disclosures are extraordinarily rare, like in the one percent of all disclosures are false disclosures." In response to the second question, Swenson

stated, "I don't think I really have an answer to that." Molde's trial counsel did not object to either of Swenson's answers, but the court permitted trial counsel to ask Swenson a follow-up question. Molde's trial counsel asked Swenson whether she based her answers to the juror's questions on particular studies, to which Swenson stated, "There are that I've read, yes. I don't know the names off the top of my head."

¶14 Ultimately, the jury found Molde guilty of first-degree sexual assault of a child who had not attained the age of twelve years and guilty of incest with a child. The circuit court later sentenced Molde to an aggregate sentence of twenty-five years' initial confinement followed by seven and one-half years' extended supervision.

¶15 Molde filed a motion for postconviction relief, and later a supplemental motion, arguing that his trial counsel was constitutionally ineffective by: (1) failing to object to Dr. Swenson's answers to the juror's questions[5] or, alternatively, failing to request a mistrial following Swenson's answers to the juror's questions; (2) failing to seek the admission of evidence regarding the victim's dishonesty pursuant to WIS. STAT. § 906.08(1); and (3) withdrawing her

---

[5] In Molde's postconviction motion and his briefing on appeal, he at times alleges that his trial counsel was constitutionally ineffective by failing to object to the juror's questions, as opposed to Dr. Swenson's answers to those questions. Because we ultimately conclude that Molde's trial counsel was ineffective by failing to object to Swenson's answer to the first question, we need not reach the issue of whether trial counsel was ineffective by failing to anticipate that Swenson's answers to the questions would have provided impermissible vouching testimony. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (stating that we decide cases on the narrowest possible grounds).

objection to evidence of Molde's prior acts.[6] Regarding his first claim, Molde argued that Swenson's answers provided an opinion of Lauren's credibility and constituted impermissible vouching testimony in violation of *State v. Haseltine*, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984).

¶16 Following a *Machner* hearing, the circuit court determined that Molde's trial counsel did not perform deficiently by failing to object to Dr. Swenson's answers to the juror's questions because the questions posed "would have been within the purview of" expert opinion and did not constitute impermissible vouching testimony. Further, the court determined that Molde's trial counsel did not perform deficiently by failing to object to Swenson's answers because she cross-examined Swenson regarding the basis for her answers. The court also denied the two remaining claims raised by Molde, finding that his trial counsel did not perform deficiently because each decision made by trial counsel was part of her reasonable trial strategy.

¶17 Molde now appeals his judgment of conviction and the circuit court's order denying his postconviction motion for a new trial. Additional facts will be provided below as necessary.

---

[6] Molde also argued that his trial counsel was constitutionally ineffective by failing to object to the circuit court's use of an "improper legal standard" to deny Molde's motion to admit evidence of the victim's hospital records. The circuit court denied this claim, and Molde does not raise that issue on appeal. We will therefore not consider this issue further. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the [circuit] court, but not raised on appeal, is deemed abandoned.").

**DISCUSSION**

¶18    To succeed on an ineffective assistance of counsel claim, a defendant must show that his or her counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To prove deficient performance, a defendant must show that counsel's acts or omissions were 'outside the wide range of professionally competent assistance,' and were 'errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Morales-Pedrosa*, 369 Wis. 2d 75, ¶16 (citations omitted). "[I]neffective assistance of counsel cases [are] limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue." *State v. Arrington*, 2022 WI 53, ¶73, 402 Wis. 2d 675, 976 N.W.2d 453 (second alteration in original; citation omitted).

¶19    "To prove prejudice, a defendant must show the alleged errors of counsel were 'of such magnitude that there is a reasonable probability that, absent the errors, the result of the proceeding would have been different.'" *Morales-Pedrosa*, 369 Wis. 2d 75, ¶17 (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sholar*, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). "[A] defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice." *Id.*, ¶44 (citation omitted).

> Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the

9

remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

¶20   An ineffective assistance of counsel claim "involves the application of constitutional principles to historical facts." *Arrington*, 402 Wis. 2d 675, ¶33 (citation omitted). "We uphold the circuit court's findings of historical or evidentiary fact unless they are clearly erroneous. We then independently review the application of constitutional principles to the facts found." *Id.* (citation omitted).

## I.  Failure to object to impermissible vouching testimony

¶21   According to Molde, his trial counsel provided ineffective assistance by failing to object to Dr. Swenson's answers to Juror No. 47's questions. We agree, specifically with respect to counsel's failure to object to Swenson's answer that child sexual assault "[f]alse disclosures are extraordinarily rare, like in the one percent of all disclosures are false disclosures."[7]

A.  The law was clear that Dr. Swenson's answer to the juror's first question constituted impermissible vouching testimony.

¶22   "[T]he jury is the lie detector in the courtroom." *Haseltine*, 120 Wis. 2d at 96 (alteration in original; citation omitted). "No witness, expert or

---

[7] Because we conclude that Molde's trial counsel provided ineffective assistance by failing to object to Dr. Swenson's answer to the juror's first question, we need not determine whether his trial counsel provided ineffective assistance by failing to request a mistrial once Swenson provided her answers to the juror's questions.

otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Id.*

> Often called the "*Haseltine* rule," this principle is rooted in the rules of evidence that say "expert testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" "Expert testimony does not assist the fact-finder if it conveys to the jury the expert's own beliefs as to the veracity of another witness."

*State v. Maday*, 2017 WI 28, ¶34, 374 Wis. 2d 164, 892 N.W.2d 611 (citations omitted). "The question of whether a witness has improperly testified as to the credibility of another witness is a question of law which we review independently." *State v. Tutlewski*, 231 Wis. 2d 379, 386, 605 N.W.2d 561 (Ct. App. 1999) (citation omitted).

¶23    In *Haseltine*, a defendant was charged with sexual contact based on allegations that he had "fondl[ed] his daughter's breasts." *Haseltine*, 120 Wis. 2d at 94-95. During a jury trial, the State called a psychiatrist who testified as an expert to the "pattern of behavior exhibited by incest victims" before stating that there "was no doubt whatsoever" that the defendant's daughter was an incest victim. *Id.* at 95-96. On appeal, this court concluded that the circuit court's decision to admit the psychiatrist's testimony regarding the truthfulness of the victim's accusations was erroneous. *Id.* at 96. We held that the psychiatrist's testimony that the defendant's daughter "was an incest victim is an opinion that she was telling the truth." *Id.*

¶24    In *Morales-Pedrosa*, a decision released in 2016, the defendant was accused of sexually assaulting a child when the child was between the ages of thirteen and fifteen. *See Morales-Pedrosa*, 369 Wis. 2d 75, ¶2. During the trial, the State called a forensic interviewer as an expert witness. *Id.*, ¶12. The expert

was not the individual who performed the forensic interview of the victim, and the expert had never met the victim. *Id.*, ¶23. On redirect examination, the State asked the expert, "[I]n your training and experience when you're eliminating the alternative hypotheses, is it commonly understood that approximately 90 percent of reported cases are true?" *Id.*, ¶19 (alteration in original). The expert stated, "Correct." *Id.* Following a guilty verdict, the defendant argued that his trial counsel was ineffective by failing to object to the State's question regarding the truthfulness of accusers. *Id.*, ¶14.

¶25 On appeal, we analyzed *Haseltine* and other case law to determine that "Wisconsin law was not clear at the time of [the defendant's] trial (and remains unclear) on the question of whether general statistical testimony alone might constitute impermissible vouching." *Morales-Pedrosa*, 369 Wis. 2d 75, ¶26. We differentiated *Haseltine* in several ways. First, the forensic interviewer never met with the victim and, thus, "there was no risk the jury believed [the forensic interviewer] was providing a personal or particularized opinion" as to the victim's credibility. *Morales-Pedrosa*, 369 Wis. 2d 75, ¶23. Further, the forensic interviewer "never suggested [the victim] was like the generalized ninety percent nor connected the statistic to her report of abuse or the likelihood she was telling the truth." *Id.*, ¶25.

¶26 Finally, the forensic interviewer's "generalized confirmation" that 90 percent of reported cases are true "did not constitute a statistical 'opinion' that was functionally equivalent to her testifying [that the victim] was being truthful with her accusations in this case." *Id.*, ¶23. "[G]eneral testimony that '90 percent' of children claiming to have been abused are telling the truth would have less impact on a fact finder and be less obviously objectionable than testimony that '99.5%,' '98%,' or even '92-98%' are telling the truth." *Id.*, ¶25. However, we

explicitly left open the question "for another day … what type of statistical testimony might effectively constitute improper vouching." *Id.*, ¶25.

¶27 That question was answered in *Mader*. In that case, the defendant was charged with one count of repeated sexual assault of the same child.[8] *Mader*, 408 Wis. 2d 632, ¶1. At trial, the State's first witness was a retired therapist who had spent "more than thirty years treating victims of sexual abuse," although she did not provide therapy to the victim in that case. *Id.*, ¶5. We summarized the remainder of her testimony as follows:

> [The therapist] agreed with the State's characterization of her as "a pretty good gauge" of the trustworthiness of persons who report sexual assault, having provided therapy to "well over" five hundred victims in her career. She testified that she had experienced only four instances of false reporting in over three decades of working with victims and told the jury about "research on false reporting" indicating that only three to eight percent of reports are false.

*Id.*, ¶33. The therapist also described false reporting as "very uncommon." *Id.*, ¶6. Similarly, a law enforcement investigator who interviewed the victim testified that "'[o]ut of about 150' reports he had investigated, only one 'was a false report.'" *Id.*, ¶7 (alteration in original). Defense counsel did not object to any of this testimony, and the jury later found the defendant guilty of repeated sexual assault of the same child. *Id.*, ¶¶23, 32.

---

[8] Molde submitted *State v. Mader*, 2023 WI App 35, 408 Wis. 2d 632, 993 N.W.2d 761, *review denied* (WI Sept. 26, 2023) (No. 2022AP382-CR), to this court as supplemental authority. *See* WIS. STAT. RULE 809.19(10). The State did not respond to his submission. *See* RULE 809.19(11).

¶28 We concluded that the law on vouching testimony was clear enough at the time of the trial such that the defendant's counsel performed deficiently by failing to object to the therapist's and the investigator's testimony. *Id.*, ¶¶35-38. We explained, "The testimony of [the therapist] and [the investigator] bears both of the hallmarks we flagged in *Morales-Pedrosa* as likely to turn statistical testimony about the prevalence of false reports of sexual assault into improper vouching." *Mader*, 408 Wis. 2d 632, ¶38. Although the therapist had not met with or counseled the victim, the investigator testified that he had interviewed the victim multiple times throughout the course of his investigation. *Id.* The investigator then provided a "detailed account of his interactions" with the victim. *Id.* Thus, when he provided his answer that he had only ever investigated one false report in roughly 150 investigations, "it would be clear to a jury that he did not count [the victim's report] as a false report. His testimony would inevitably be seen by the jury as 'a personal or particularized' endorsement of [the victim's] credibility." *Id.* (citing *Morales-Pedrosa*, 369 Wis. 2d 75, ¶23).

¶29 Moreover, the "extreme rarity of false reports to which [the therapist] and [the investigator] attested also weigh[ed] in favor of finding a *Haseltine* violation." *Mader*, 408 Wis. 2d 632, ¶39. Particularly, the therapist "essentially told the jury that 99.2% of the victims she had worked with had truthfully reported," and the investigator essentially told the jury that 99.3% of reports are truthful. *Id.* "[T]hese percentages 'provided a mathematical statement approaching certainty' that false reporting simply does not occur." *Id.* (citing *Morales-Pedrosa*, 369 Wis. 2d 75, ¶25). Based on the analysis provided in *Morales-Pedrosa*, we concluded that a "reasonably competent lawyer in [defense

counsel's] shoes should have known enough to object to this testimony. His failure to do so was deficient performance."[9] *Mader*, 408 Wis. 2d 632, ¶40.

¶30    Doctor Swenson's answer that child sexual assault "[f]alse disclosures are extraordinarily rare, like in the one percent of all disclosures are false disclosures," falls squarely within the meaning of impermissible vouching testimony articulated in *Morales-Pedrosa* and *Mader*. While Swenson did not personally interview Lauren, she supervised, in real time, Lauren's interview as the nurse practitioner's supervising physician at the children's advocacy center, as well as Lauren's physical examination, and she testified to these facts at trial.[10]

¶31    Given Dr. Swenson's testimony that she supervised Lauren's sexual assault evaluation, her answer to the juror's question regarding a child's propensity to tell the truth when reporting a sexual assault "would inevitably be seen by the jury as 'a personal or particularized' endorsement of [Lauren's] credibility." *See Mader*, 408 Wis. 2d 632, ¶38 (citing *Morales-Pedrosa*, 369 Wis. 2d 75, ¶23). Swenson effectively testified that 99 percent of all child sexual assault reports are true. This statistical opinion is far higher than that present in *Morales-Pedrosa* (90 percent) and falls into the realm of testimony warned about in that case. *See Morales-Pedrosa*, 369 Wis. 2d 75, ¶25 (stating it would be more

---

[9] In *Mader*, we relied on *State v. Morales-Pedrosa*, 2016 WI App 38, 369 Wis. 2d 75, 879 N.W.2d 772, to conclude that the vouching testimony standard was clearly established at the time of the defendant's jury trial. *Mader*, 408 Wis. 2d 632, ¶38. Accordingly, *Mader*'s holding regarding ineffective assistance of counsel applies to cases taking place after *Morales-Pedrosa* was decided. Molde's trial occurred in 2019, roughly three years after the *Morales-Pedrosa* decision. Accordingly, the holdings in *Morales-Pedrosa* and *Mader* apply to the facts of this case.

[10] Doctor Swenson also testified that she reviewed the audiovisual recording of the forensic interview prior to her testimony at trial.

clearly objectionable if there was "testimony that '99.5%,' '98%,' or even '92-98%' are telling the truth"); *Mader*, 408 Wis. 2d 632, ¶37. A 99 percent statistic "'provided a mathematical statement approaching certainty' that false reporting simply does not occur." *See Mader*, 408 Wis. 2d 632, ¶39 (citing *Morales-Pedrosa*, 369 Wis. 2d 75, ¶25).

¶32 Moreover, Molde's trial counsel testified at the *Machner* hearing that she did not have a strategic reason for failing to object to Dr. Swenson's answers. Contrary to the circuit court's reasoning, the fact that Molde's trial counsel cross-examined Swenson about the basis for her testimony does not alter our conclusion because, without a reasonable trial strategy to the contrary, "[a] reasonably competent lawyer in [Molde's trial counsel]'s shoes should have known enough to object to this testimony. [Her] failure to do so was deficient performance." *See Mader*, 408 Wis. 2d 632, ¶40.

B. Trial counsel's failure to object to Dr. Swenson's answer was prejudicial.

¶33 We must now consider whether Molde was prejudiced by his trial counsel's failure to object to Dr. Swenson's testimony that only one percent of all child sexual assault disclosures are false disclosures.[11] In doing so, we "must consider the totality of the evidence before the … jury." *See Maday*, 374 Wis. 2d 164, ¶58 (citation omitted).

¶34 The State argues that Molde cannot demonstrate prejudice because the evidence presented at trial weighed heavily in favor of Molde's guilt. For

---

[11] In light of our holding in *Mader*, we ordered, and the parties provided, supplemental briefing to address whether Molde's trial counsel's failure to object to Dr. Swenson's answer to the juror's first question resulted in prejudice.

example, the State contends that Lauren's story was consistent and detailed, that her credibility was buttressed by the fact that she engaged in self-harming behavior, and that she sent her sister, Amanda, a message on her cell phone detailing the sexual assault roughly one week prior to her suicide attempt. Conversely, Molde asserts that the trial was one "in which the evidence for and against guilt was nearly in equipoise" and "in which external endorsements of credibility … carr[ied] significant weight." *See **Mader***, 408 Wis. 2d 632, ¶86.

¶35  Our analysis in ***Mader*** is instructive on whether Molde's defense was prejudiced by his trial counsel's deficient performance as discussed above. In ***Mader***, we concluded that trial counsel's failure to object to the therapist's and the investigator's testimony about the truthfulness of accusers, although deficient, was not prejudicial because "the evidence presented at trial weighed significantly in the State's favor." ***Id.***, ¶¶82, 86.

¶36  The sexual assault victim in ***Mader*** "provided detailed accounts of numerous sexual assaults that occurred over a multi-year period." ***Id.***, ¶82. For example, the victim "described a reddish birthmark on [the defendant]'s penis that could only be seen when his penis was erect" (which was corroborated by law enforcement photographs); "described an evolving course of increasingly sexual conduct"; "acknowledged enjoying [the sexual] encounters initially and having fun 'work[ing] to not get caught'"; and "included dates, locations, [and] significant contemporaneous events (such as the births of her half sisters)." ***Id.***, ¶82 (third alteration in original).

¶37  Significant details of the victim's accusations were also corroborated by other witnesses and evidence at the trial. ***Id.***, ¶83. For example, one witness "testified that [the victim] disclosed [to him] a sexual relationship with

17

[the defendant] years before she reported the assaults to the police." *Id.* Likewise, the victim's mother testified that she once discovered the defendant "with his hands underneath the covers of [the victim]'s bed," which matched one of the victim's stories that the defendant was touching her sexually under her covers on one occasion when her mother walked into her bedroom. *Id.*, ¶¶10, 15, 83. The victim's mother also testified that she found a homemade sex toy attached to the defendant's underwear, which matched one of the victim's other stories that the defendant used the sex toy during one sexual assault. *Id.*, ¶¶10, 15. We also noted that the defendant did not present "a compelling alibi or other defense," aside from his accusation that the victim's mother "'put [the victim] up to' concocting the assault allegations." *Id.*, ¶¶84, 86.

¶38     While this is a close case regarding prejudice, we conclude that Molde's trial counsel's failure to object to the impermissible vouching testimony undermines our confidence in the outcome of the trial. *See Sholar*, 381 Wis. 2d 560, ¶33. To begin, Dr. Swenson's vouching testimony was a direct response to a juror's question. Juror No. 47 specifically asked for, and received, an answer regarding the credibility of sexual abuse victims from an expert witness directly involved in treating Lauren. This same juror later submitted another question, which the circuit court declined to present, asking whether a different witness believed that Lauren was "telling the truth about these stories of [Molde] assaulting" her. Importantly, Juror No. 47 served on the final twelve-person jury that convicted Molde of the crimes charged.

¶39     Furthermore, the State twice highlighted the impermissible vouching testimony during its closing arguments. During its initial closing argument, the State said, "And you also need to take into consideration Dr. Swenson's testimony that false disclosures are extraordinarily rare. They're in the one percent of cases

that she's seen." In its rebuttal closing argument, the State again argued, "And would [Lauren] have kept this consistent disclosure for two years if this was a false report? And, keep in mind, false reports only occur one percent of the time, according to Swenson." Therefore, the State essentially argued to the jury that Lauren could not be lying about what occurred because Swenson testified that 99 percent of all child sexual assault reports are true.

¶40 Lastly, contrary to the State's assertion on appeal, the evidence presented at trial by the State was not as strong as that in *Mader*, and given the trial record, there is a reasonable probability that the jury would not have convicted Molde absent the impermissible vouching testimony. "[Molde]'s conviction depended on the jury believing [Lauren]'s testimony." *See Haseltine*, 120 Wis. 2d at 96. The sexual assault allegation was not independently corroborated by other evidence; there was no physical evidence; there was only one sexual assault that occurred during a one-year period roughly four to five years prior to Lauren's accusation; and some aspects of Lauren's story changed over time.[12] *See State v. Krueger*, 2008 WI App 162, ¶18, 314 Wis. 2d 605, 762 N.W.2d 114 ("Significant to our determination of performance and prejudice is the fact that [the victim's] account of the sexual assault was not corroborated by independent evidence and, as such, the issue at trial was one of credibility.").

¶41 As to this last point, Lauren's version of events changed in some respects from her forensic interview to her trial testimony. For example, Lauren testified that Molde told her after the sexual assault that what had occurred "was

---

[12] Our analysis and conclusion should not be interpreted as indicating any subjective belief as to the truthfulness of Lauren's accusation.

our little secret." This fact was not provided in the forensic interview. Further, Lauren stated in her forensic interview that she had a conversation with Whitney directly after the sexual assault; however, at trial Lauren testified that she did not speak to Whitney until the next day. Also, Lauren stated in her forensic interview that Molde took off his clothing after she entered the bedroom, whereas at trial Lauren stated that she thought he was already unclothed when she entered. While these discrepancies could simply be a product of the harrowing nature of the alleged event—and the time that had passed between the assault and the trial—they still weigh in the defense's favor in a prejudice analysis.

¶42 Significantly, several defense witnesses—including witnesses who were allegedly at the house during the assault—testified that no such assault occurred and provided evidence negatively affecting Lauren's credibility. For example, Whitney testified that Molde never instructed her to get Lauren; that she never stood in the bedroom doorway while Lauren was inside Molde's bedroom; and that she never told Lauren that she wanted to "be a big girl for daddy." Similarly, Whitney was interviewed by Dunn County Human Services following Lauren's suicide attempt and stated that she did not recall an incident like the one alleged by Lauren ever occurring.[13]

---

[13] The State does not argue that Whitney's testimony regarding a dream she had corroborated Lauren's accusation. Specifically, Whitney testified that she had a dream in which Molde "came downstairs and woke [Lauren] up and brought her back upstairs" and sexually assaulted her. According to Whitney, she asked Lauren about the dream, and Lauren responded "that it was just a nightmare." Because Whitney did not mention the dream during her interview with Dunn County Human Services, because the dream differed in some respects from Lauren's account (e.g., in the dream, Molde came downstairs to get Lauren), and because Whitney denied the incident ever actually occurred, we agree that Whitney's testimony could have either bolstered or harmed Lauren's credibility and it should not be weighed strongly in favor of the State's case.

(continued)

¶43    Additionally, Stephanie testified that she did not notice any behavioral changes in Lauren or Whitney after Stephanie arrived back at the family's home in Colfax, Wisconsin. Stephanie also noted that Lauren did not appear to be in any form of physical pain. According to Stephanie, given Lauren's age, she would have expected Lauren to tell her if she was in pain. Stephanie testified that she only left the house in Colfax overnight on one occasion.[14]  In particular, she testified that she left for two consecutive nights in July 2011 because she was recreationally consuming alcohol at that time, and Molde had recently left an alcohol treatment facility and was maintaining his sobriety. This story was corroborated by Heath, one of Lauren's older brothers, who testified that his mother left for two days in the "summertime" around the period in question and that Molde was sober during that period. This evidence contradicted Lauren's testimony that she smelled alcohol on Molde's breath at the time of the alleged assault.

¶44    In addition, Heath testified that during the summer months, all of the children would sleep in the living room area of the basement at the Colfax house, not in separate rooms as Lauren alleged. He testified that he did not remember a time when Molde came downstairs and took Lauren back to his bedroom, or a

Further, the State does not contend that a note located by Trevor, one of Lauren's older brothers, corroborated the sexual assault. Trevor testified that he found the note, written by Lauren, which said "something like," "these scars are for you." We again agree with the State's omission. In particular, it was never established to whom the note was directed, where the note was found, when it was written, or even when it was found.

[14] Stephanie's testimony that she only left the house overnight on one occasion was disputed. In particular, law enforcement asked Molde during an interview whether there were "times when you were living in Colfax that you and your wife would get in a fight and she would leave for a night or two." Molde stated, "Yeah," and said that he would "kick her out of the house." Also, a social worker with Dunn County Human Services testified that Stephanie told her that she had left the Colfax home more than once in 2011.

time when Lauren and Whitney left the living room area together at night. He also stated that he was up most of the nights Stephanie was gone because he was "worrie[d] about [his] mother."

¶45 One of Lauren's cousins also testified at the trial. She stated that Lauren told her about the sexual assault "three or four" times and that each time Lauren changed her story significantly. For example, Lauren once told her that the assault occurred at a residence in Bloomer, Wisconsin, and told her on another occasion that the assault occurred at a residence near Wheeler, Wisconsin.

¶46 The State argues that Molde cannot show prejudice because he did not present a theory as to why Lauren would fabricate a sexual assault allegation against him. We disagree. In *Mader*, we stated that the trial in that case was not one "in which external endorsements of credibility might carry significant weight, as, for example, where a victim offers a vague or conclusory account of sexual assault or the defendant presents a compelling alibi or other defense." *Mader*, 408 Wis. 2d 632, ¶86. The defense in *Mader* was essentially that the mother fabricated the sexual assault. However, that theory failed to account for both the victim's testimony and the other evidence corroborating that testimony.

¶47 Here, Molde's defense was that he did not sexually assault Lauren, and his theory was bolstered by evidence at the trial. Molde's trial counsel introduced a portion of a law enforcement interview of Molde that occurred shortly after Lauren's suicide attempt. During the interview, he repeatedly and vehemently denied Lauren's accusations. Moreover, Molde maintained his

innocence throughout the circuit court proceedings, including at trial.[15] During closing arguments, Molde's trial counsel cited the inconsistencies in Lauren's accusations as well as the testimony that contradicted her story.

¶48    In all, the weight of the State's evidence at trial was significantly weaker than that in *Mader*. Under these circumstances, Molde's theory of defense adequately challenged the State's case for purposes of the prejudice analysis. *See State v. Stroik*, 2022 WI App 11, ¶65, 401 Wis. 2d 150, 972 N.W.2d 640 (concluding that a defendant's trial counsel performed deficiently at a jury trial and that the deficiency prejudiced the defense because, among other things, "[t]here was no physical evidence or witnesses to the alleged assault, and [the defendant] consistently denied the allegations").

¶49    Furthermore, contrary to the State's assertion, Molde did offer a theory as to why Lauren would falsely accuse him. In particular, Molde suggested that Lauren falsely accused him to gain sympathy and status from her peers. This theory was supported by Stephanie's testimony that Lauren engaged in self-harming activities to gain attention, which was apparently evidenced by Lauren's diary entries stating that she was "now cutting herself because [a classmate] was getting a lot of attention for it."

¶50    Molde also suggested that Lauren falsely accused him because she was unhappy with her parents and her living situation. This theory was supported by Stephanie's testimony that she and Molde scolded Lauren after discovering

---

[15] The State argues on appeal that Molde's statement to law enforcement that his children were "brutally honest," which was admitted at trial, undermined Molde's theory of defense. While Molde's statement was certainly a fact for the jury to consider, it is not a piece of evidence that completely undermined Molde's theory of defense.

Lauren's self-harming behavior, which caused Lauren to become upset. In fact, Lauren cited this incident in her suicide note to Molde, stating, "Ya know, pushing me up against a tree and screaming [in] my face when you found out I had first started cutting, wasn't the best way to go about it." Additionally, another one of Lauren's cousins testified that Lauren wanted to run away because she was mad at her parents. Molde's theory also matched evidence at trial that Lauren was upset with her parents about having to live with her grandparents after the family moved to their grandparents' home when their previous home was destroyed in a fire.

¶51 The State also asserts that "the effect of any error in admission of the [improper vouching testimony] was blunted by the jury being properly instructed that it was not bound by such testimony." "Jurors are presumed to have followed jury instructions." *State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780. Like in *Mader*, the circuit court instructed the jury that it was "the sole judge[] of credibility, that is the believability of the witnesses and the weight to be given to their testimony." *See* WIS JI—CRIMINAL 300 (2000). The court also instructed the jury that it was "not bound by any expert's opinion." *See* WIS JI—CRIMINAL 200 (2012). Even assuming that these instructions addressed Dr. Swenson's impermissible vouching testimony,[16] we conclude that the

---

[16] Of note, the circuit court did not instruct the jury that it could not *rely* on expert testimony. The court stated only that the jury was not *bound* by such testimony. *See* WIS JI—CRIMINAL 200 (2012). Similarly, while the court informed the jury that it was the sole judge of witness credibility, it also stated that "[i]n determining the credibility of each witness and the weight you give the testimony of each witness," the jury could consider "all other facts and circumstances during the trial which tend to support or discredit the testimony." Nothing in either of these instructions informed the jury that it could not consider Dr. Swenson's impermissible vouching testimony when determining whether it believed Lauren's statements that Molde sexually assaulted her.

presumption that the jury followed these instructions has been rebutted, given the foregoing discussion.

¶52    In all, this was "a case in which external endorsements of credibility … carr[ied] significant weight." *See **Mader***, 408 Wis. 2d 632, ¶86. Had Molde's trial counsel objected to Dr. Swenson's testimony that 99 percent of all child sexual assault reports are true, there is a reasonable probability that the result of the trial would have been different. Accordingly, we reverse the judgment of conviction and the circuit court's order denying Molde's postconviction motion on this issue, and we remand for a new trial.

## II. Failure to elicit witness testimony pursuant to WIS. STAT. § 906.08(1)

¶53    Molde also contends that his trial counsel was constitutionally ineffective by failing to seek the admission of evidence regarding Lauren's dishonesty pursuant to WIS. STAT. § 906.08(1). According to Molde, several witnesses "had personal knowledge of [Lauren]'s untruthful character and were available and willing to testify to that fact." We conclude that Molde failed to demonstrate that his trial counsel performed deficiently because the manner in which Molde's trial counsel attacked Lauren's credibility using other witnesses was constitutionally sufficient.

¶54    As is pertinent here, WIS. STAT. § 906.08(1) provides that "the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion," but "[t]he evidence may refer only to character for truthfulness or untruthfulness." Molde's trial counsel did not ask any witnesses— including Stephanie, Heath, Whitney, Trevor, and two of Lauren's cousins— whether Lauren had a character for untruthfulness. At the ***Machner*** hearing, Molde's trial counsel testified that it was not a strategic decision for her not to

25

elicit evidence of Lauren's character for untruthfulness pursuant to § 906.08(1) and that doing so would have been helpful to the defense's theory.

¶55     As was described in detail in the previous section, however, each of these witnesses provided evidence corroborating Molde's defense. *See supra* ¶¶42-45. We agree with the State that after the testimony of those witnesses, "it would have been patently clear to the jury that [Lauren]'s family members … did not believe [her] allegations against Molde."

¶56     While Molde's trial counsel could have attacked Lauren's credibility pursuant to WIS. STAT. § 906.08(1), counsel adequately challenged Lauren in other ways and introduced evidence that diminished Lauren's credibility through indirect means. *See **State v. Thiel***, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 ("Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." (citation omitted)). In some trials, it may be more advantageous to indirectly attack a victim's character for truthfulness rather than directly, and here, Molde's trial counsel chose to indirectly attack Lauren's credibility. Trial counsel's admission that, in hindsight, a direct approach would have been beneficial to the defense does not alter our analysis or our conclusion that her performance was not constitutionally deficient. *See **id.*** (stating that courts must avoid the "distorting effects of hindsight" when assessing an attorney's performance).

## III.  Withdrawing an objection to a prior conviction

¶57     Lastly, Molde argues that his trial counsel was constitutionally ineffective by withdrawing an objection to evidence of Molde's prior acts. Specifically, prior to trial, the circuit court ruled that any reference to Molde's 2012 incarceration for an OWI conviction would be prohibited. On the first day of

26

the trial, Molde's trial counsel stated that the "defense is withdrawing our objection that [Lauren] could not say that her father went to jail" in an attempt to demonstrate that the sexual assault did not occur as the State suggested. According to Molde, his trial counsel should have investigated or considered other possible methods for attacking Lauren's credibility. Molde suggests that one strategy would have simply been to agree that Molde was "out of the home" after January 20, 2012.

¶58   At trial, Lauren testified that she remembered Molde "going to jail for a period of time in 2012" and that the sexual assault occurred sometime before he left to begin serving that sentence. A law enforcement officer testified at trial that Molde was in jail for the OWI offense from January 20, 2012, to July 2012.

¶59   Molde's trial counsel testified at the **_Machner_** hearing that the purpose of bringing in the OWI conviction and subsequent jail sentence into evidence was to demonstrate that the alleged sexual assault did not occur because Lauren stated the assault

> occurred at a time when her mom packed her bags and left the house and before her dad went to jail—when he was still drinking. And the only time that [Stephanie] packed her bags and left the house was after [Molde] had served a jail sentence[17] and when he was sober.

Trial counsel admitted, however, that using the conviction and jail sentence was a "mistake" and that "[t]here could have been a better solution." Despite counsel's

---

[17] We note that Stephanie testified that Molde went into treatment in July 2011 and that is when she left for two nights. Because Molde did not begin his jail sentence until January 2012, we interpret as incorrect trial counsel's reference to Stephanie leaving for two nights *after* Molde served his jail sentence.

admission, the circuit court concluded that her trial strategy to discredit Lauren was reasonable and that Molde therefore failed to establish deficient performance.

¶60    We likewise conclude that trial counsel's strategy was reasonable. Trial "[c]ounsel's decisions in choosing a trial strategy are to be given great deference." *State v. Breitzman*, 2017 WI 100, ¶38, 378 Wis. 2d 431, 904 N.W.2d 93 (alteration in original; citation omitted). We "will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Id.*, ¶65 (alteration in original; citation omitted). "[W]here a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Id.* (citation omitted).

¶61    The jail sentence benefited the defense in two respects. First, it established a definitive end date for the sexual assault timeline—January 20, 2012. After that date, there can be no question that Molde was in jail and never lived in the Colfax house again. Unlike informing the jury that Molde had simply left the home or was "out of the home," the definitive jail sentence left the jury without a doubt as to Molde's location and reason for leaving the Colfax home.

¶62    Second, and relatedly, the jail sentence established that Molde had a problem with alcohol—a fact already known to the jury through other evidence—but that he was trying to maintain his sobriety during the period in question. The fact that his excessive alcohol use resulted in legal trouble lends credence to Stephanie's testimony that she left for two nights following Molde's return from alcohol treatment. It also contradicted Lauren's testimony that she smelled alcohol on Molde's breath during the sexual assault. In other words, Molde's trial counsel's decision to withdraw the objection was a strategic one—by bringing in

the OWI conviction, counsel was able to attack Lauren's credibility and shrink the State's timeline of events.

¶63 In addition, Molde's misdemeanor OWI conviction paled in comparison to, and shared no common elements with, the charges of first-degree sexual assault of a child who had not attained the age of twelve years and incest with a child that Molde faced. Therefore, there was little risk that the jury would convict Molde of the crimes charged simply because he was convicted of an OWI charge. *Cf.* ***State v. Alexander***, 214 Wis. 2d 628, 642-43, 571 N.W.2d 662 (1997) ("[W]here the prior offense is similar or of the same nature or character as the charged crime, the risk of unfair prejudice is particularly great."). In short, although there were other ways to attack Lauren's credibility as evidenced at the ***Machner*** hearing, the strategy invoked by Molde's trial counsel was reasonable.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings.

Not recommended for publication in the official reports.