COURT OF APPEALS
DECISION
DATED AND FILED

July 23, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1089-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF350

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

BRANDON A. DARNICK,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Oneida County: PATRICK F. O'MELIA, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Brandon Darnick appeals a judgment, entered upon a jury's verdict, convicting him of first-degree sexual assault of a child (sexual

contact with a person under the age of thirteen). He also appeals a circuit court order denying his motion for postconviction relief following a ***Machner***[1] hearing. Darnick asserts that his trial counsel was constitutionally ineffective in several respects and that the court erroneously exercised its discretion by denying his motion for a mistrial. For the reasons that follow, we affirm.

## BACKGROUND

¶2 The State charged Darnick with one count of first-degree sexual assault of a child (sexual contact with a person under the age of thirteen) following allegations that he sexually assaulted Damian[2] in December 2013 when Damian was two years old. The case proceeded to a jury trial.

¶3 At the trial, Damian's mother, Cindy, testified that, in December 2013, she dropped Damian off for an overnight visit at the apartment of Darnick's mother and that she picked Damian up around noon the next day. According to Cindy, shortly after returning home from the apartment, Damian informed her that he had to use the bathroom. Cindy testified that Damian's need to defecate at that time of day was unusual because he would almost always go to the bathroom while he was midway through eating his dinner.

¶4 Cindy stated that she took Damian to the bathroom and then went to change out of her work clothes. While Cindy was in the other room, Damian began crying, stating that "his bottom hurt" while he was on the toilet trying to

---

[1] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[2] Pursuant to the policy underlying Wis. Stat. Rule 809.86(4) (2021-22), we use pseudonyms when referring to the victim and the victim's mother in this case. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

defecate. Cindy took Damian from the toilet, laid him down, lifted his ankles, and wiped "between his butt cheeks" to remove any material "that could have been irritating" him.

¶5    In the process of wiping Damian's bottom, Cindy discovered that Damian's "anus was very red." Damian then repeatedly told Cindy that "the doctor put his belly up my butt." Cindy testified that she did not know the identity of the "doctor" to whom Damian was referring. Based on Damian's behavior and her observations, Cindy took Damian to the hospital.

¶6    A sexual assault nurse examiner (SANE) testified that she collected anal swabs from Damian while performing his examination at the hospital.[3] During the examination, Damian pointed to his buttocks and told the SANE that "[t]he doctor put his butt in my belly." The SANE testified that she observed "[r]edness" or "irritation" "around [Damian's] anal area."

¶7    The swabs were analyzed approximately four years later. A forensic DNA analyst with Sorenson Forensics testified that her laboratory performed an analysis on the swabs from Damian's SANE examination.[4] The Sorenson analyst testified that the laboratory conducted a test for a particular type of protein that is "found in high concentrations in seminal fluid." The test result was "inconclusive," meaning that sperm could "potentially be present."

---

[3] According to the SANE, anal swabs pick up "dried secretions" through a process in which a SANE wets the end of one swab with sterile water and rolls it over the anal area and then takes a dry swab and rolls it over that same area.

[4] The delay in testing was a result of a backlog of SANE kits at the Wisconsin State Crime Laboratory (SCL). Pursuant to the Wisconsin Sexual Assault Kit Initiative, the SCL contracted with Sorenson Forensics to conduct the initial analysis on the swabs in this case.

¶8 The Sorenson analyst stated that based on the inconclusive result of the seminal fluid test, the laboratory also conducted a "differential extraction" process on the swabs. In a differential extraction process, the potential sperm cells from a DNA sample are separated from the nonsperm cells—i.e., epithelial cells—in order to create separate DNA profiles. According to the Sorenson analyst, epithelial cells are "most often skin cells." In addition, a sperm cell contains only twenty-three chromosomes whereas a skin cell contains forty-six chromosomes. Therefore, according to the Sorenson analyst, more than one sperm cell is needed to develop a DNA profile from sperm cells. Two profiles—a "sperm fraction" and a "nonsperm fraction"—were developed from the differential extraction and were forwarded to the SCL along with the remaining anal swab material.

¶9 An SCL analyst testified that she analyzed the two DNA profiles developed by Sorenson Forensics and determined that the nonsperm fraction belonged to Damian and the sperm fraction belonged to Darnick. Additionally, using a small amount of remaining material from the interior of the swabs, the SCL analyst conducted an independent differential extraction. After separating the sperm fraction from the nonsperm fraction, the SCL analyst microscopically examined the sperm fraction. Despite the differential extraction being conducted using the interior of the swabs, there being very little material left on the swabs, and DNA being easily wiped away, the SCL analyst located "one sperm cell" in the sperm fraction.

¶10 The State presented a number of other witnesses, and Darnick testified in his own defense. Following an inaccurate comment the State made during its closing argument that Darnick's sperm was found *inside* Damian's anus, Darnick's trial counsel moved for a mistrial. The circuit court denied the motion, and the jury ultimately found Darnick guilty of the crime charged.

¶11    Darnick filed a motion for postconviction relief, arguing that his trial counsel was constitutionally ineffective in several respects. Darnick also argued that the circuit court erroneously exercised its discretion by denying his trial counsel's motion for a mistrial. Following a *Machner* hearing and additional briefing by the parties, the court denied Darnick's postconviction motion.

¶12    Darnick now appeals. Additional facts will be provided below as necessary.

## DISCUSSION

### I.    Ineffective assistance of counsel

¶13    To succeed on a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We need not address both ineffective assistance of counsel prongs if we conclude that a defendant failed to prove one prong. *Id.* at 697.

¶14    To prove deficient performance, a defendant must overcome a "strong presumption" that he or she received adequate representation and must "show that counsel's acts or omissions were 'outside the wide range of professionally competent assistance.'" *State v. Morales-Pedrosa*, 2016 WI App 38, ¶16, 369 Wis. 2d 75, 879 N.W.2d 772 (citation omitted). "To prove prejudice, a defendant must show the alleged errors of counsel were 'of such magnitude that there is a reasonable probability that, absent the errors, the result of the proceeding would have been different.'" *Id.*, ¶17 (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sholar*, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89 (citation

omitted). "[A] defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice." *Id.*, ¶44 (citation omitted).

¶15 "Both deficient performance and prejudice present mixed questions of fact and law. We uphold the [circuit] court's factual findings unless clearly erroneous; but whether counsel's performance was deficient or prejudicial is a question of law we review de novo." *Morales-Pedrosa*, 369 Wis. 2d 75, ¶18 (citations omitted).

### A. Evidence regarding the forensic analyses and cell transfer

¶16 Darnick first contends that his trial counsel was constitutionally ineffective by failing to introduce certain evidence at trial related to the forensic analyses and cell transfer. Specifically, Darnick asserts that his trial counsel should have introduced evidence: "that there can be carryover of epithelial cells into the sperm fraction during the differential extraction process" and that carryover occurred in this case; "that there is no way to determine which type of cells Darnick's DNA profile was developed from"; and that the State's experts "had not determined that the sperm cell belonged to Darnick."[5]

¶17 Darnick's postconviction motion included an attached expert report completed by an analyst with an independent forensics company. The expert

---

[5] Darnick also argues that his trial counsel should have introduced evidence regarding "the durability and transfer of DNA and sperm cells by touch" to counter the evidence at trial that sperm cells can "survive" outside of the male body for only seventy-two hours. Even with the durability time frame suggested at trial, however, Darnick's sperm was plausibly found on Damian's anal area in a manner consistent with his theory of defense. Similarly, as the State suggests on appeal, a longer period of durability "would have strengthened [its] case by establishing that sperm can be detectable even after all of the time that elapsed between the [SCL] sending the sample to Sorenson [Forensics] and receiving the [swabs] back from them." Accordingly, Darnick fails to establish prejudice for this claim.

opined that "carryover" can occur during a differential extraction process when there is not a "clean separation of the two cell fractions." According to the expert, "[c]arryover is most commonly observed as an undesired transfer of epithelial cells into the … sperm cell fraction." When this transfer occurs, it is "possible to generate a DNA profile(s) from a sperm cell fraction when in fact sperm cells are not physically present if sufficient quantities of DNA were to be present."

¶18    Regarding cell transfer, the expert opined that "even if one's DNA is found to be associated with an article of evidence, questions arise regarding both how and when that DNA was transferred" to that evidence. The expert added that "the chance of 'innocent' or incidental DNA transfer (such as from a penis to an individual's hands and then to another object) greatly increases as the amount of starting material for DNA profiling tests becomes smaller." The expert admitted, however, that "[t]here currently are not any tests at our disposal that would allow us to determine when or how DNA came to be associated with an item."

¶19    Darnick contends that had his trial counsel consulted with an expert, "he would have gained knowledge of this information and could have used it to develop a two-fold theory of defense"—first, "while Darnick's DNA was present, only one, or even none, of his sperm cells were present"; and second, "even if the sperm cell belonged to Darnick, there was an innocent explanation for how it got there."

¶20    We conclude that even if Darnick's trial counsel performed deficiently by failing to investigate the forensic analyses with respect to cell transfer, that deficient performance did not prejudice Darnick's defense. We reach this conclusion because sufficient evidence was elicited at trial demonstrating that accidental transfer of sperm cells was possible in this case. Darnick's trial counsel

testified at the *Machner* hearing that the theory of defense at trial was "accidental transference"—i.e., that Darnick "had sperm on his hands left over from … prior sexual activity" "and that this had transferred over" to Damian's anal area.

¶21   Consistent with that theory, Darnick's trial counsel asked the Sorenson analyst whether the DNA testing "gives any indication of how anything got anywhere[?]"  The Sorenson analyst responded, "We are just looking for DNA.  We can't tell how it got there or when it got there, anything about the scenario.  We can just say whether it's there or not."  This testimony regarding cell transfer was entirely consistent with Darnick's postconviction expert's opinion that while transfer is possible, there is no available test to determine "when or how DNA came to be associated with" an item.

¶22   The evidence regarding cell transfer was also consistent with Darnick's trial testimony.  According to Darnick, he had unprotected sex with his girlfriend the night before the alleged sexual assault with Damian.  Darnick stated that he twice ejaculated into his girlfriend and also put his fingers into her vagina both before and after ejaculating.  According to Darnick, he did not shower or wash his hands after having sex until later the next day.  Darnick denied ever being alone with Damian that morning expect when he helped Damian in the bathroom.  Specifically, Darnick recalled that on the morning of the alleged sexual assault, Damian defecated in the bathroom, and, afterward, Darnick "wiped his butt" using toilet paper.  Only then did Darnick wash his hands.  Darnick testified that wiping Damian's bottom with semen on Darnick's hand from the previous evening was "the only possible way that th[e] semen was found" on Damian's anal area.

¶23 Given the foregoing, it would have been clear to the jury that accidental transfer of sperm cells was possible, both generally and specifically in this case. Any expert testimony regarding these matters would have therefore been of marginal value.

¶24 Further, any deficient performance on behalf of Darnick's trial counsel by not introducing evidence of carryover during the extraction process did not prejudice Darnick's defense. Darnick's postconviction expert acknowledged that differential extraction is intended "to physically separate epithelial cell DNA from sperm cell DNA in a sample in which both cells types may be comingled." Only when there is not "a clean separation of the two cell fractions"—and when "sufficient quantities" of epithelial cells are present—can a sperm fraction be developed that does not actually contain sperm cells.

¶25 Thus, in order to successfully argue that "only one, or even none, of his sperm cells were present" in his DNA profile, Darnick would have had to convince the jury that the Sorenson analyst incorrectly separated the two cell fractions despite the analyst's testimony that nothing "unusual" occurred in the differential extraction.[6] In addition, Darnick would have had to convince the jury

---

[6] Darnick argues that carryover did occur in this case. In support, he cites to a Sorenson Forensics report stating that the sperm fraction included "[a] mixture of DNA profiles from two contributors, at least one of which genetically types as male." The first DNA profile matched Darnick, and the second profile was "assumed" to be Damian's profile. According to Darnick, this fact demonstrates that it is possible that his DNA profile was also developed from epithelial cells because Damian could not have produced sperm cells.

However, Sorenson Forensics explained in an email to the SCL that its analysts referred to the sperm fraction as a mixture because the "known contributor is present below the analytical threshold in order to perform a deduction." According to Sorenson Forensics, this approach allowed the laboratory "to obtain more information that otherwise would have been lost." Consistent with that reasoning, the SCL analyzed the sperm fraction and concluded that it was not a "mixture" and in no way matched Damian's DNA profile.

that, notwithstanding the fact that the differential extraction process is designed to separate epithelial cell DNA from sperm cell DNA, there were "sufficient quantities" of his epithelial cells in the sperm fraction to create a DNA profile.

¶26    Indeed, Darnick would have also had to overcome a number of facts demonstrating that there was no carryover, that the sperm cell found was his, and that there were likely more sperm cells present on the swabs.[7]  Under the facts of this case, we agree with the State that there is not a reasonable probability that any reasonable juror would have accepted the carryover theory.  Therefore, we conclude that Darnick has not met his burden of proving that his trial counsel's failure to elicit evidence of potential carryover in the differential extraction process prejudiced Darnick's defense.[8]

---

[7] These facts included that the protein test result indicated that sperm could "potentially be present" on one of the swabs (i.e., it was not a completely negative result); the sperm fraction was Darnick's; a sperm cell was found on Damian's anal area using the same process that was used to develop Darnick's DNA profile; and the sperm cell was found using only a small amount of the remaining interior of the swabs.

[8] Darnick also argues that his trial counsel was constitutionally ineffective by failing to object to "statements by [an] officer and prosecutors describing the sperm cells as Darnick's." Darnick fails to identify or cite any such statements. *See* WIS. STAT. RULE 809.19(1)(e); *Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990) (holding that this court will refuse to consider arguments unsupported by citations to the record).

(continued)

B. Darnick's statements

¶27     Next, Darnick asserts that his trial counsel was ineffective by failing to introduce portions of an audiovisual recording, or the contents, of Darnick's interview with David Geiss, a detective with the Minocqua Police Department. According to Darnick, Geiss's trial testimony was inconsistent with the recorded interview. Darnick contends that he did not "just volunteer explanations for why his DNA was on the anal swab[s]"; rather, "when pressed for an explanation, he started to suggest masturbation as a possibility."

¶28     In the recorded interview, Geiss asked Darnick why his DNA would be on the swabs. Darnick stated to Geiss, "[T]he only way that could ever [happen is] like maybe if I was in the bathroom before, you know, jacking off or something." Later in the interview, Darnick told Geiss,

> [L]ike I said that's the only way that that could have happened is if it was maybe before the kids woke up or something, and I was in the bathroom, and I, you know, ejaculated, wiped myself. But I don't know how I would use that paper if it was in the garbage. Like, you know, so like there's, there's no way, there's no way in hell that would even happen.

Regardless, upon our independent review, we find Darnick's argument meritless. Two such statements were made during the evidentiary portion of the trial. For example, a detective testified that he reinterviewed Darnick once after the forensics "identified the DNA as [Darnick's] and that it was from semen." The remaining statements were made during the State's closing argument. Contrary to Darnick's characterization, these statements were each made in the context of the forensic analyses concluding that the differential extraction process is intended to separate epithelial cell DNA from sperm cell DNA, that the swabs may have contained seminal fluid, that the sperm fraction DNA profile was Darnick's, and that a sperm cell was located on the interior material of the swabs. In other words, the statements were reasonable inferences from the forensic evidence presented and were not objectionable. *See State v. Hurley*, 2015 WI 35, ¶95, 361 Wis. 2d 529, 861 N.W.2d 174 (stating that trial counsel is permitted to draw any reasonable inference from the evidence when making closing arguments). To the extent the statements made during the evidentiary portion of the trial were objectionable, not objecting to them was not prejudicial to Darnick's defense because the statements were isolated and few in number, especially when considered in the context of the entire three-day trial.

....

> And I got fucking set up, dude. And I swear to God I'm
> not trying to blame anybody, but I swear to God, [Cindy]
> set me up, dude. I swear to God, because she coaches
> [Damian] and tells him what to say.

At trial, the State asked Geiss whether Darnick provided Geiss with "any reasons that the sperm could have gotten onto [Damian]'s anus?" Geiss testified that Darnick stated that semen could have been found on the swabs either because he had "*maybe*" been masturbating and that his semen "somehow got on [Damian]" or that Cindy "was setting him up." (Emphasis added.)

¶29 We agree with the State that Geiss's trial testimony was "completely consistent" with what Darnick stated to Geiss in the interview. Geiss did not state that Darnick definitively told Geiss that he had been masturbating—rather, Geiss stated that Darnick offered two potential "reasons" why his DNA may have been on the swabs. Thus, Darnick has failed to establish that his trial counsel performed deficiently by failing to introduce the audiovisual recording, or the contents, of the interview.[9]

¶30 Darnick also asserts that his trial counsel was constitutionally ineffective by failing to: (1) object to the State's questioning of Darnick on

---

[9] Darnick also claims that his trial counsel "improperly portray[ed]" Darnick's statements from the interview when questioning Darnick on direct examination. According to Darnick, his trial counsel improperly asked "Darnick to agree that he had given [Geiss] two reasons" why his DNA had been found on the swabs. However, Darnick fails to demonstrate how trial counsel's direct examination of Darnick "improperly portray[ed]" Darnick's statements. As articulated above, Darnick did provide Geiss with two reasons why his DNA was on the swabs. In addition, Darnick's trial counsel elicited testimony from Darnick regarding why he gave two reasons for his DNA being found on the swabs—in particular, because Darnick was "very upset" after being "accused of being a child molester." Darnick has failed to demonstrate that his trial counsel performed deficiently when questioning Darnick at trial.

12

cross-examination regarding his statements to Geiss; and (2) introduce portions of the interview or question Geiss further to rebut the State's "implication of recent fabrication." Specifically, the State asked Darnick whether he told Geiss that "it's possible [he] could have masturbated in the bathroom and that got on [Damian]." The State also asked Darnick whether he masturbated in the bathroom the morning of the alleged sexual assault; if he had memory of "whether or not" he masturbated that morning; and whether he told Geiss that he had masturbated that morning.

¶31 Darnick fails to demonstrate why these questions were inappropriate or how they constituted "implication[s] of recent fabrication." We also note that introducing the audiovisual recording would have run the risk of further contradicting Darnick's theory of defense at trial that his DNA was found on the swabs only because he had sex with his girlfriend the night before the alleged sexual assault. The audiovisual recording confirms that even though Darnick was simply offering possibilities for his DNA being found on the swabs, he did not inform Geiss that he had sex with his girlfriend the night before the alleged sexual assault. Therefore, Darnick has failed to demonstrate that his trial counsel performed deficiently with respect to his approach to the State's cross-examination of Darnick.

C. Cindy's statement

¶32 Darnick next contends that his trial counsel was constitutionally ineffective by failing to introduce Cindy's "inconsistent statement" to Geiss that Damian "had pooped after she picked him up" from the apartment. At trial, Cindy stated that Damian had not "poop[ed]" when she found him on the toilet crying. According to Darnick, the "fact that [Damian] … defecated … could explain the redness Cindy observed, as well as [Damian]'s statements about his butt hurting."

13

¶33    At the *Machner* hearing, Darnick's trial counsel implied that he could not recall precisely why he did not impeach Cindy with her prior statement but testified that "when cross-examining relatives of alleged sexual assault victims, especially child sexual assault victims, one has to tread fairly cautiously" because "[y]ou don't want to alienate the jury" "by attacking an alleged victim's family member."  Darnick's trial counsel added that he "[m]aybe" missed the discrepancy, and he admitted to stating in an email sent prior to the *Machner* hearing that he "[s]hould have" impeached Cindy with her prior statement to Geiss.

¶34    The circuit court found that Darnick's trial counsel did not perform deficiently because his decision not to attack Cindy's "inconsistent statement" was "well within the range of acceptable tactical decisions" and was "consistent with common practice among the defense bar."  The court found this conclusion to be "particularly true in light of the minute nature of the discrepancies in the two accounts given by" Cindy.

¶35    Other than citing to trial counsel's email sent prior to the *Machner* hearing, Darnick fails to explain why the circuit court's finding was clearly erroneous.  *See State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93 ("[W]here a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" (citation omitted)).  The fact that trial counsel could not recall exactly why he chose not to impeach Cindy with her prior statement does not mean the court's finding was clearly erroneous.  *See Harrington v. Richter*, 562 U.S. 86, 109 (2011) (courts may not "insist counsel confirm every aspect of the strategic basis for his or her actions").  The court was permitted to rely on trial

14

counsel's statement that his common practice is to "tread as cautiously as possible" when cross-examining relatives of alleged child sexual assault victims.

¶36 The circuit court's finding is similarly not clearly erroneous simply because trial counsel suggested, in hindsight, that impeachment was "[m]aybe" the better strategy. *See* **State v. Thiel**, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 ("When evaluating counsel's performance, courts are to be 'highly deferential' and must avoid the 'distorting effects of hindsight.'" (citation omitted)); **Harrington**, 562 U.S. at 109 ("After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better …. **Strickland**, however, calls for an inquiry into the objective reasonableness of counsel's performance ….").  Thus, Darnick has failed to demonstrate that his trial counsel performed deficiently by not introducing Cindy's prior statement.

¶37 Darnick has similarly failed to prove that introducing Cindy's prior statement to Geiss would have had any impact on the outcome of the trial.  As the circuit court found, Cindy's statement to Geiss differed only slightly from her trial testimony and did so in an inconsequential manner.  The slight difference in the statements would not have been seen as a surprising discrepancy in her story given that the trial occurred five years after her statements to Geiss.  Whether Damian defecated on the toilet was not particularly relevant to whether Darnick had sexual contact with him.  There is no evidence in the record to suggest that Damian's buttocks—particularly his anal area—would have shown signs of irritation simply from using the bathroom.  What was undisputed was that Damian had the urge to defecate at an odd time of the day.  Moreover, whether Damian defecated or not, Cindy's pertinent trial testimony matched the statements she made to Geiss—namely, that she took Damian to the hospital because he appeared to be in pain

and had told her that "the doctor put his belly up my butt." Consequently, Darnick has also failed to demonstrate that he was prejudiced by his trial counsel's failure to introduce Cindy's prior statement to Geiss.

### D. Cody's statements

¶38 Darnick also argues that his trial counsel was constitutionally ineffective by failing to refresh the recollection of Darnick's younger brother Cody at trial using Cody's statements to Geiss from the day after the alleged sexual assault. Specifically, Cody, then seventeen years old, told Geiss that he was at the apartment the morning of the alleged sexual assault and that he did not hear Damian "get upset about anything or complain of anything hurting." However, Cody testified at trial that he could not remember a time when Damian stayed at the apartment. Cody confirmed that in 2013 he was not "very interested in spending a lot of time with toddlers," and he recalled spending time with Damian only once at a bowling alley and whenever his grandma would take him to Cindy's house.

¶39 At the *Machner* hearing, Darnick's trial counsel testified that he did not attempt to refresh Cody's recollection because his original statement to Geiss did not contain much substantive information. The circuit court found that Darnick's trial counsel "made a reasonable tactical decision to decline to pursue Cody's testimony" because counsel felt that Cody could not add to the theory of defense. The court further reasoned that "Cody's corroboration of evidence elicited from several other witnesses would do little to further the defense."

¶40 Again, Darnick fails to demonstrate why the circuit court's finding regarding his trial counsel's strategy is clearly erroneous. By Cody's own admission, he had little interest in Damian back in 2013 because Cody was a

teenager. As the State asserts, "[g]iven Cody's testimony that he wasn't much interested in [Damian] and didn't pay much attention at the time, his statement to Geiss would've established nothing at all—[Damian] could well have been in pain or upset and Cody wouldn't have noticed." Because Darnick's trial counsel had a reasonable strategy for not refreshing Cody's recollection, Darnick has failed to establish that his trial counsel performed deficiently.

¶41    Further, Darnick has failed to establish that he was prejudiced by his trial counsel's failure to refresh Cody's recollection because two witnesses—Darnick's mother and his brother-in-law—testified that Damian was acting normal and was not in distress on the morning of the alleged sexual assault. Moreover, these same witnesses testified that Cody was not at the apartment for at least several hours that morning.

### E.  The State's closing argument

¶42    Next, Darnick contends that his trial counsel was constitutionally ineffective by failing to object to specific statements the State made during its closing argument. According to Darnick, the State erroneously argued that "Darnick had told [Geiss] that [Darnick] did masturbate in the bathroom that morning but was now denying it" and that there was "definitely more than one sperm cell on [Damian]'s butt."[10]

---

[10] Although not entirely clear from Darnick's briefing, it appears that he also asserts that his trial counsel was ineffective by failing to object to the State's closing argument that Darnick's DNA and sperm were found in Damian's anus. Darnick concedes, however, that his trial counsel did object to this statement and that the circuit court sustained the objection. Because Darnick's trial counsel successfully objected to the State's argument, Darnick's trial counsel did not perform deficiently in that regard.

¶43    The State "may not ask jurors to draw inferences that [it knows] or should know are not true." *State v. Weiss*, 2008 WI App 72, ¶15, 312 Wis. 2d 382, 752 N.W.2d 372. "However, '[c]ounsel is allowed considerable latitude in closing arguments,' and is permitted to draw any reasonable inference from the evidence." *State v. Hurley*, 2015 WI 35, ¶95, 361 Wis. 2d 529, 861 N.W.2d 174 (alteration in original; citation omitted).

¶44    During its closing argument, the State argued that Darnick told Geiss during the interview,

> [W]ell, … I was masturbating that morning. Now here at trial, no, no I didn't masturbate. I have a healthy sexual relationship with my girlfriend. We had sex twice. I don't need to masturbate…. [I]n that moment that was the self-serving statement that came to mind. When he had more time to think about it, [the story] got more detailed.

¶45    The circuit court found that Darnick's trial counsel did not perform deficiently because the State's comments were not objectionable. Specifically, the court found that the State's argument was "a reasonable interpretation of [Darnick's] statements, which the State … used to call [Darnick's] credibility into question." According to the court, the "thrust of the State's rhetoric is that [Darnick]'s explanations were divergent, and that this signals that both accounts were fabricated. That is a perfectly reasonable interpretation of the evidence …."

¶46    Again, the circuit court's findings are not clearly erroneous. Contrary to Darnick's assertion on appeal, the State did not argue to the jury that Darnick told Geiss he had masturbated "in the bathroom." Geiss testified that Darnick told him that his DNA could have been found on Damian's anal area

because Darnick had "maybe" been masturbating and that the semen "somehow got on [Damian]."[11] The State was not arguing that the jury should consider evidence that was not in the record. Rather, consistent with Geiss's testimony, the State was simply arguing that Darnick had first provided one potential explanation but then provided a different explanation at trial.

¶47 Likewise, the circuit court found that the State's argument that there was "definitely more than one sperm cell on [Damian]'s butt" was a reasonable inference from the evidence presented at trial. Specifically, the court found that the State "invited the jury to infer that, because the [DNA] profile would necessarily need to be created from the genetic information of multiple [sperm cells], should the DNA have come only from [sperm cells], one could reasonably infer that the lone sperm cell identified was one of many such cells."

¶48 These circuit court findings are not clearly erroneous. Although the State admitted that only one sperm cell was definitively located during the analyses of the swabs, it *argued* that there were more sperm cells on the swabs. This inference was valid, according to the State, because the located sperm cell was discovered by the SCL from the remaining small amount of interior material on the swabs; the protein test demonstrated that the swabs may have had seminal fluid on them; and the SCL analyst testified that DNA can easily be wiped away. Furthermore, consistent with the trial testimony, the State argued that the

---

[11] To the extent that Darnick argues that the State's closing argument was inconsistent with Geiss's recording of the interview, which was not introduced at trial, we disagree. As the State argued in its closing argument, Darnick initially told Geiss that his DNA may have been found on the swabs because Darnick maybe masturbated before he wiped Damian's bottom. Darnick's second statement that "there's no way" his DNA was found on the swabs does not change the fact that he initially told Geiss of his masturbation theory.

laboratory—in order to obtain a DNA profile from sperm cells—required more than one sperm cell from a sample. Thus, the State did not impermissibly argue that there were more sperm cells on the swabs than were actually discovered. Accordingly, Darnick's trial counsel did not perform deficiently by failing to object to the State's closing argument.

F. Aggregate prejudice

¶49     Darnick also contends that he was prejudiced by his trial counsel's deficient performance in the aggregate. "[W]hen a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice." *Thiel*, 264 Wis. 2d 571, ¶59. However, a defendant "may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial." *Id.*, ¶61.

¶50     As discussed above, most of Darnick's ineffective assistance of counsel claims fail on the deficiency prong. With respect to trial counsel's failure to challenge certain aspects of the State's DNA evidence, Darnick asserts that without the sperm cell evidence, the State's case was "not nearly as convincing." Not only does this assertion illogically remove a key piece of evidence from the trial, Darnick understates the strength of the sperm fraction evidence discussed previously as well as the fact that the jury did not find credible his transference theory.

¶51     Whether Darnick's ineffective assistance of counsel claims are considered individually or together, there is no prejudice to accumulate—"Zero plus zero equals zero." *See State v. Brown*, 85 Wis. 2d 341, 353, 270 N.W.2d 87

(Ct. App. 1978) (citation omitted). As such, Darnick failed to demonstrate any prejudice arising out of his counsel's alleged deficiencies.

## II. Mistrial motion

¶52 Lastly, Darnick asserts that the circuit court erroneously exercised its discretion by denying his motion for a mistrial following statements the State made during its closing argument.

¶53 "When faced with a motion for mistrial, '[a] circuit court must decide, in light of the entire facts and circumstances, whether … the claimed error is sufficiently prejudicial to warrant a mistrial.'" *State v. Debrow*, 2023 WI 54, ¶15, 408 Wis. 2d 178, 992 N.W.2d 114 (citation omitted). We review a court's decision to grant or deny a motion for a mistrial for an erroneous exercise of discretion. *Id.* "An erroneous exercise of discretion may arise from an error in law or from the failure of the circuit court to base its decisions on the facts in the record." *Id.* (citation omitted). "[A] reviewing court may search the record for reasons to sustain [a] circuit court's exercise of discretion." *State v. LaCount*, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780.

¶54     During its rebuttal closing argument, the State claimed on three occasions that Darnick's sperm and/or DNA were found "in" Damian's anus.[12] On the last of these occasions, the State argued, "And remember, [Darnick] says he wiped the kid's butt.  He doesn't—he can't give an explanation for why [his sperm is] *in the child's anus*….  Wiping the butt and getting it *in the anus*, that's a very … different thing.  That is not reasonable."  (Emphasis added.)

¶55     Darnick's trial counsel requested a sidebar, which was later summarized outside the presence of the jury as follows:

> I had objected during [the State's] rebuttal closing statement to [the] use of the … phrase ["]in the anus.["]  My objection was that that was mischaracterizing the evidence.  There had been no evidence that any DNA was found in the anus but only on and around the anus.  In our sidebar, [the prosecutor] indicated that she had corrected herself in her rebuttal closing.  That did not happen.

---

[12] Although Darnick objected to only one statement, the State made two other similar statements in its rebuttal closing argument.  On the first occasion, the State argued that Darnick "became sexually aroused and sexually gratified through ejaculation into or onto the child's anus."  On the second occasion, the State argued, "There is no other explanation for how sperm and DNA gets *in a two-and-a-half-year-old's anus*."  (Emphasis added.)  Contrary to Darnick's assertion, we question whether the first statement was actually incorrect.  There was evidence presented that Damian may have had semen in his rectum.  For example, evidence demonstrated that seminal fluid in the rectum can cause a sensation that makes an individual feel like they have to defecate and that penetration, attempted penetration, or exterior rubbing can cause irritation around the anal area.  Damian demonstrated both of these symptoms.  As the circuit court instructed the jury, sexual contact can occur by several means, and the State did not have to prove exactly how Darnick became sexually aroused or gratified, only that arousal or gratification occurred by intentional means.  Regardless, we will assume without deciding that the first statement was incorrect and that Darnick did not forfeit his challenges to either statement.

Darnick also contends that the State made other incorrect statements in its closing argument.  Specifically, Darnick argues that the State's multiple references to Damian's accusation that the "the doctor put his belly up my butt" were incorrect.  We disagree.  There was ample evidence presented at the trial that Damian told Cindy and the SANE either "the doctor put his belly up my butt" or "[t]he doctor put his butt in my belly."  Although the parties disagreed over the meaning of Damian's statements, the statements were in evidence and could be relied upon by the State in its closing argument.

¶56     The circuit court denied the motion.  It noted that the prosecutor had stated she would correct the error but that "she did not ultimately."  The court found that the closing arguments lasted "for a little over an hour and that was one word and she did move on.  It was not harped on.  And the jury heard all the facts.  They heard the arguments."  According to the court, there were "also references and also mistakes in both counsels' argument.  Not mistakes in terms of material, but mistakes in words, okay?  And, again, that happens, whether it be nerves or you're reading your notes, thinking of something else.  All that is minuscule compared to the whole argument."  Likewise, the court stated that the jury would "use their own recollections about what was said and look at the instruction."  Specifically, the court instructed the jury that the parties' closing "arguments and conclusions and opinions are not evidence."  *See* WIS JI—CRIMINAL 160 (2000).

¶57     We conclude that the circuit court did not erroneously exercise its discretion by denying the motion for a mistrial.  Contrary to Darnick's assertion on appeal, the court applied the correct legal standard and considered the State's errors in the context of both the parties' closing arguments and the entire jury trial.  Specifically, the court stated that the State's errors were minor when compared to the length of the closing arguments and that the jury would consider the evidence presented during the trial according to the court's instructions and by "us[ing] their own recollections about what was said."  *See **Debrow***, 408 Wis. 2d 178, ¶15.

¶58     While Darnick argues that the State's errors in its closing argument prejudiced the trial and "undermine[d]" his theory of defense, the circuit court's analysis was reasonably based on the facts of record.  Much of the trial focused on DNA evidence.  At no point, however, did the jury hear erroneous evidence concerning DNA or sperm being found *in* Damian's anus.  In fact, the SANE

specifically testified that, consistent with her common practice, she avoided conducting a "rectal swab" on Damian because he was prepubescent.[13]

¶59 Consistent with the admitted DNA evidence, the State made at least twenty-one references during its closing argument to DNA and/or sperm being found "on" Damian's anus. Conversely, the State made only two references to DNA and/or sperm being found "in" Damian's anus. In addition, as the circuit court reasoned in its order denying Darnick's postconviction motion, the court properly instructed the jury that the parties' closing arguments were not evidence, and we presume the jury followed that instruction. *See **State v. Truax***, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989). Consequently, there was little risk that the jury would confuse the State's misstatements with the actual evidence presented during trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[13] The SANE testified that a "rectal swab" involves an examination into the rectum.